[No. G030377. Fourth Dist., Div. Three. June 30, 2003.]

COMMONWEALTH ENERGY CORPORATION, Plaintiff and Respondent, v.
INVESTOR DATA EXCHANGE, INC., et al., Defendants and Appellants.

## COUNSEL

Law Office of James Swiderski, James Swiderski; Law Office of James J. Moneer and James J. Moneer for Defendant and Appellant Investor Data Exchange.

Henry Gomez, in pro. per., for Defendant and Appellant.

Rus, Miliband & Smith, Ronald Rus, Randall A. Smith, Leo J. Presiado and Jay B. Wallace for Plaintiff and Respondent.

## OPINION

**SILLS, P. J.—**

I

In this case we affirm the denial of defendant Investor Data Exchange's anti- SLAPP suit motion. Just because a telemarketing pitch is made on behalf of a firm that sells information does not mean that the pitch is being made in connection with a *public issue* or an *issue of public interest.*

II

During his tenure as CEO of plaintiff Commonwealth Energy Corporation, Fred Bloom gave Henry Gomez, an employee of Investor Data, a list of Commonwealth's shareholders. Investor Data then used the list to "contact" the shareholders on the phone and offer them Investor Data's services, including a free one-year membership.

The contact just mentioned can most accurately be described as "telemarketing," with most of the pejorative connotations which the word has come to bear in the early 21st century. (E.g., Probst, *Telemarketing, Commercial*

*Speech, and Central Hudson: Potential First Amendment Problems for Indiana Code Section 24–4.7 and Other "Do-Not-Call" Legislation* (2002) 37 Val. U. L.Rev. 347, 347 ["Which do Americans hate more: Osama Bin Laden or telemarketers?"].) As acknowledged in the appellant's opening brief, the callers were instructed to follow a "carefully drafted information sheet in all of their calls," that is, follow a prepared script. (Cf. *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 303 [116 Cal.Rptr.2d 833] ["a series of questions and answers familiar to all who have had the peace of their evening meal disturbed by a call from a telemarketer"].)

The script was *not* a disquisition on the role of information in the investment market or the general need to be wary about investment scams. It was not even a warning to the shareholders about the soundness of their investment in Commonwealth. Rather, it focused exclusively on pitching Investor Data's investigatory services. Ironically, part of the spiel was that by signing up with Investor Data the investors could somehow short-circuit the need to check out telemarketers.[1]

We reproduce the "carefully drafted information sheet" here, verbatim from the record:

"Is this Mr. (Mrs.) …?

·"My name is … with Investor Data Exchange. I understand you're a Commonwealth shareholder. Is that correct?

"We've been told by a Commonwealth stockholder that the list of stockholders has been taken by some of the salesmen who worked there, and they've sold your name to firms selling investments, so you may start getting a lot of telemarketing calls, if you're not already.

"IDE was started by investors like you who got tired of being swamped with telemarketing call, [*sic*] and realized [they] couldn't afford to check them out properly. So they set up a club to investigate them together, and exchange information on what they discovered.

"The members [*sic*] who's a Commonwealth stockholder convinced us to offer you a free one year trial membership. As a club member,

"1) You can refer the sales call to IDE.

---

[1] The option of hanging up on all telemarketers was not mentioned.

"2) Or send the investment information to us under a limited power of attorney.

"3) Either way we compare the investment to a model based on the actual results of thousands of similar investments.

"4) Then we report the results to you ... and the company who sent it to you.

"5) If everything checks out IDE members visit the company for onsite verification.

"6) Then we let all the club members know about the ones that completely check out. So you get access to everything that every other club member has been approached on too.

"You also get monthly newsletters with scam alerts, as well as educational articles and other useful information.

"Normally all this call costs [*sic* —probably should be "all costs"] $295 a year, which would start in your second year, but there is no obligation to renew it if you don't want to.

"Should I send you an package [*sic*] about your membership?

"NO—Okay, but would you want to write down our toll free number in case you change [your mind and] you need us in the future?

"YES—Great. We'll send it out to you, it's about eight pages of examples of how IDE works. Do you want to receive it by mail, email or fax?"

The calls prompted Commonwealth to file suit against Investor Data and Henry Gomez for a variety of business-related causes of action. The three most substantive were misappropriation of trade secrets, unfair business practices, and false advertising. The key charging allegation is that telemarketers for Investor Data "have been recently and repeatedly contacting

Commonwealth stockholders to solicit memberships in" Investor Data. Investor Data made an unsuccessful motion to dismiss the case under the anti-SLAPP statute (Code Civ. Proc., § 425.16).[2] Investor Data and Gomez now appeal from the denial order.[3]

## III

## A

The consideration of anti-SLAPP motions is a two-step process. (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 88 [124 Cal.Rptr.2d 530, 52 P.3d 703].) The first step is to determine whether "the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity." (*Ibid.*) Only if such a showing is made should the court proceed on to the second step, which is to determine whether the *plaintiff* has demonstrated a probability of prevailing on the claim. (*Ibid.*; *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 [124 Cal.Rptr.2d 507, 52 P.3d 685].)

Here, the parties devote considerable briefing to the effects of a prior, unpublished decision of this court, *Commonwealth Energy Corporation v. Chappell* (Jan. 15, 2002, G026344) (nonpub. opn.), which is relevant to the second step.[4] If we were to spend substantial time with that problem without first ascertaining that Investor Data made the requisite threshold showing, we

---

[2] The term stands for "strategic lawsuit against public participation." The concept of the "SLAPP" suit was invented by two law professors who were concerned with the tendency on the part of moneyed interests to use the traditional torts which implicate free speech (usually defamation and intentional interference with somebody else's business in all its permutations) against individual activists who opposed those interests in public fora. (See Comment, *Strategic Lawsuits Against Public Participation: An Analysis of the Solutions* (1990/1991) 27 Cal. Western L.Rev. 399.)

All further statutory references in this opinion will be to the Code of Civil Procedure.

[3] Commonwealth's motion, relying on *Decker v. U.D. Registry, Inc.* (2003) 105 Cal.App.4th 1382 [129 Cal.Rptr.2d 892], to dismiss Gomez' timely appeal on the theory that he only joined in Investors Data's motion and did not bring his own is denied. *Decker* was based on the theory that the appellant was not bound by the order. (See *id.* at p. 1391.) Since Gomez' joinder requested relief as to Gomez himself, he is bound by the current order, and accordingly the *Decker* rationale doesn't apply.

[4] In that case we held that an anti-SLAPP motion brought by a former Commonwealth vice president who anonymously sent copies of an unfavorable article about Commonwealth to persons on the shareholder list *should* have been granted. Thus we had to take the "probability" step. In that regard, we noted that Commonwealth produced no evidence that the former vice president had any reason to know the shareholder list was a trade secret. We now grant Investor Data's request to take judicial notice of the opinion. (See Cal. Rules of Court, rule 977(b)(1) [collateral estoppel exception to citation or reliance on nonpublished opinion].) However, it doesn't do Investor Data any good — it is only relevant to the second step, which we don't take in this opinion.

would, in effect, turn the anti-SLAPP statute into a cheap substitute for summary judgment. (See *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 851, fn. 12 [111 Cal.Rptr.2d 582] ["An anti-SLAPP suit motion is not a substitute for a demurrer or summary judgment motion."].) The point is, if the moving defendant cannot meet the *threshold* showing, then the fact that he or she might be able to otherwise prevail on the merits under the "probability" step is irrelevant.

B

The threshold showing, i.e., step one in the *Navellier* court's metaphor, can be taken in two different ways. Prior to *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106 [81 Cal.Rptr.2d 471, 969 P.2d 564], there had been some confusion as to whether there was always a need for the free speech or petition rights asserted by the defendant to have been exercised in connection with a "public issue" or an "issue of public interest." *Briggs* cleared that up. ▄ The rule is now that if the speech was made or the activity was conducted in an official proceeding authorized by law, there is no need that it be connected to a public issue. But if made or conducted apart from an official proceeding, then there is a public issue requirement. (*Id.* at p. 1117 [differentiating Code Civ. Proc., § 425.16, subdivision (e), clauses (1) and (2) from same section and subdivision, clauses (3) and (4)].)[5]

---

[5] For purposes of this case we will assume, without deciding, that commercial telemarketing may be considered as an "exercise" of a person's constitutional right to free speech for purposes of the anti-SLAPP statute, so that the complaint can be said to have "arisen from" that exercise. The assumption is certainly plausible enough. Commentators on commercial telemarketing tend to speak in terms of balancing the free speech rights they assume that telemarketers have with the right to privacy of the individuals they call. See, e.g., Pattison and McGann, *State Telemarketing Legislation: A Whole Lotta Law Goin' On!* (2003) 3 Wyo. L.Rev. 167, 169 ("Although telemarketers engage in First Amendment protected commercial speech, their rights need to be balanced by individuals' right to privacy."); Bae, *Pop-Up Advertising Online: Slaying the Hydra* (2003) 29 Rutgers Computer & Tech. L.J. 139, 149 (noting that Congress had assumed the need to balance "commercial freedoms of speech" with privacy rights of individuals in enacting the Telephone Consumer Protection Act in 1991); Probst, *Telemarketing, Commercial Speech, and Central Hudson: Potential First Amendment Problems for Indiana Code Section 24–4.7 and Other "Do-Not-Call" Legislation, supra,* 37 Val. U. L.Rev. at pp. 367–368 ("Legitimate privacy expectations of consumers must be balanced not only against the First Amendment rights of companies who would use telemarketing as a means of advertising, but also against the First Amendment rights of consumers who may be willing to receive that information from telemarketers."); Dambacher, *Hanging Up on the First Amendment: An Analysis of Contemporary Telemarketing Regulations* (2002) 14 Loy. Consumer L.Rev. 325, 326 ("the First Amendment interests of telemarketers must be balanced against the consumer's privacy interests"); Shannon, *Combating Unsolicited Sales Calls: The "Do-Not-Call" Approach to Solving the Telemarketing Problem* (2001) 27 J. Legis. 381, 383 ("Professor Nadel begins his discussion by noting that the 'constitutional right to privacy

In the present case, there is clearly no official proceeding, so the threshold showing depends entirely on whether Investor Data's statements were made in connection with a public issue. Up until *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913 [130 Cal.Rptr.2d 81], relatively few cases had dealt with the meaning of the public issue-public interest aspect of the anti-SLAPP statute (see *id.* at p. 919) and none systematically. ▮ In *Rivero*, however, Justice Haerle ascertained three general categories of cases fitting the prong:

(1) The subject of the statement or activity precipitating the claim was a person or entity in the public eye. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 924, citing, inter alia, *Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 239 [83 Cal.Rptr.2d 677] [Mother Jones's article on nationally known political consultant].)

(2) The statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct participants. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 924, citing, inter alia, *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 [102 Cal.Rptr.2d 205] [statements in unofficial community paper about general manager of large senior citizen community].)

(3) The statement or activity precipitating the claim involved a topic of widespread public interest. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 924, citing *M. G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 629 [107 Cal.Rptr.2d 504] [Sports Illustrated article on child molestation in youth sports].)

Applying these categories, the *Rivero* court held that union fliers defaming a janitorial supervisor over a staff of eight custodians at a residential house on

---

supports regulation protecting individuals against undesired unsolicited phone calls.' At the same time, the First Amendment protects the commercial speech of telemarketers.").

The balancing approach was also used by a panel of this court (see *People v. Orange County Charitable Services* (1999) 73 Cal.App.4th 1054, 1078–1079 [ 87 Cal.Rptr.2d 253] [noting that restrictions on commercial fundraiser who worked for charities did not constitute "undue burden on free speech"], though to describe the telemarketing in that case as "charitable" would be, er, charitable indeed. The telemarketer defendants there had "no shame." (*Id.* at p. 1060.) They did work for charities—charities they themselves started—and only as a means of indirectly lining their own pockets by keeping most of the donations they received for themselves. (See *id.* at pp. 1061–1069 [compendium of fraudulent fund-raising practices].) The remarkable thing is that, given the egregious conduct involved in *Orange County Charitable Services,* we were willing to assume the defendants had free speech rights at all—an exercise rather like worrying over whether securities laws outlawing fraudulent stock promotions constitute an "undue burden" on free speech rights. If we were willing to assume that telemarketing is an exercise of free speech (albeit subject to being burdened) in *Orange County Charitable Services,* we are certainly on safe ground in doing so now.

the U.C. Berkeley campus did not concern a public issue or an issue of public interest. To extrapolate a series of personal incidents into a public policy debate would mean that *every* workplace dispute would qualify as a matter of public interest. (*Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO, supra,* 105 Cal.App.4th at p. 924.)

The theme of a need to go beyond the parochial particulars of the given parties was most recently articulated in *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595 [132 Cal.Rptr.2d 191]. There, another panel of this court held that advertising claims made on behalf of an herbal supplement promising breast enlargement did not invoke a public issue or an issue of public interest. (See *id.* at pp. 600–603.) The key to the opinion was its examination of the *specific nature of the speech* rather than the generalities that might be abstracted from it. (See *id.* at p. 601.) The claims were not about "herbal supplements in general." Rather, the speech concerned "the specific properties and efficacy of a particular product." (*Ibid.*)

*Trimedica* and *Rivero* effectively stand for the rejection of what might be called the synecdoche theory of public issue in the anti-SLAPP statute. The part is not synonymous with the greater whole. Selling an herbal breast enlargement product is not a disquisition on alternative medicine. Lying about the supervisor of eight union workers is not singing one of those old Pete Seeger union songs (e.g., "There Once Was a Union Maid"). And, in the case before us, hawking an investigatory service is not an economics lecture on the importance of information for efficient markets.

The speech here fits none of the *Rivero* categories. The telemarketing statements were about Investor Data, not about Commonwealth *qua* post-deregulation energy company, and Investor Data is not an entity in the public eye. While investment scams *generally* might affect large numbers of people, the specific speech here was a telemarketing pitch for a particular service marketed to a very few number of people. Nor can it be said that the telemarketing statements were about an issue of widespread public interest. The speech was about Investor Data's *services,* not about investment scams in general.

By the same token, the general importance of consumer information (e.g., *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528, 1544 [1 Cal.Rptr.2d 514] ) does nothing to make the sales pitch here implicate an issue of public interest. Just because you are selling something that is intrinsically important does not mean that the public is interested in the fact that you are selling it. Unlike a disgruntled homebuyer in *Paradise Hills* who actually said something *about* the product she was protesting (see *id.* at p. 1535), the message the telemarketers used here was solely about Investor Data's services.

*DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562 [92 Cal.Rptr.2d 755], which probably offers the best support for Investor Data, is distinguishable, as it was in *Trimedica*, based both on numbers affected and the nature of the speech. *DuPont Merck* involved allegedly false statements about Coumadin, which is a rat poison used on humans as a blood thinner. More than 1.8 million Americans take it for the prevention and treatment of blood clots. (See *Trimedica, supra,* 107 Cal.App.4th at p. 602.) The case before us involves merely a commercial service (though, as we said, an important one) offered to a relatively small group of presumably sophisticated investors who had, by definition, already invested in one specific firm. And, unlike *DuPont Merck,* it did not concern the plaintiff's product, but the defendant's product.

## IV

The order is affirmed. Respondent shall recover its costs.

Rylaarsdam, J., and O'Leary, J. concurred.

A petition for a rehearing was denied July 30, 2003, and appellants' petition for review by the Supreme Court was denied October 22, 2003. Brown, J., did not participate therein.