[No. A101100. First Dist., Div. One. Aug. 17, 2004.]

SCOTT WILBANKS et al., Plaintiffs and Appellants, v.
GLORIA WOLK, Defendant and Respondent.

884

## COUNSEL

Steven Ames Brown for Plaintiffs and Appellants.

James R. Wheaton, David Greene and Matthew J. Zimmerman for Defendant and Respondent.

## OPINION

**STEIN, Acting P. J.**—This is an appeal from an order granting a special motion to strike a complaint as a Strategic Lawsuit Against Public Participation (SLAPP), pursuant to Code of Civil Procedure section 425.16, and awarding defendant her attorney fees. We find that the suit was subject to the special motion to dismiss, requiring plaintiffs to establish a reasonable probability of prevailing on the merits. We further find that plaintiffs made the requisite showing. We therefore reverse.

## BACKGROUND

The case concerns statements allegedly made against a viatical settlements brokerage, and the owner of the brokerage.[1] According to a 2001 article in Forbes Magazine, viaticals are arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits. As a practical matter, the sooner the viator dies, the greater the return on the investment. In the meantime, the viator obtains funds to pay for medical care or other expenses. Viatical settlement firms provide the capital used to purchase the policies, typically receiving a fee of 20 to 30 percent of the amount of the death benefits. The policies are sold through independent sales agents, or brokers, such as plaintiffs here. The agents or brokers can receive sales commission of 9 percent or more. (Coolidge, *Death Wish* (Mar. 19, 2001) Forbes Magazine, at p. 206.)

Gloria Wolk, a former insurance agent, has written several books on viaticals, acting as a "consumer watchdog" and an expert on issues surrounding viatical settlements. Wolk established a Web site entitled Viatical & Life Settlements: Consumer Information <www.viatical-expert.net> (as of Aug. 17, 2004). The Web site presents information about viatical settlements, based, apparently, on Wolk's own research. It advertises Wolk's books. It posts advertisements from other sources. In addition, as is particularly relevant here, Wolk, through her Web site, provides information about those who broker life insurance policies, including information about licenses, suits brought by clients against brokers and investigations of brokers by governmental agencies.

Plaintiff Scott Wilbanks is, or was, the president and chief executive officer of Wilbanks & Associates. Plaintiff Wilbanks & Associates is, or was, a viatical settlements broker. According to plaintiffs, Wolk published the following statements about them on her Web site:

---

[1] The owner, Scott Wilbanks, points out he is not a joint entity with the brokerage, Wilbanks & Associates, Inc., a point that provides him with appellate arguments not available to the brokerage. We need not, and do not, address this matter in any detail, and for convenience generally refer to the owner and the brokerage, jointly, as plaintiffs.

*"Be very careful when dealing with this broker. Wilbanks and Assoc. is under investigation by the CA dept. of insurance. The complaint originated with a California viator who won a judgment against Wilbanks. How many others have been injured but didn't have the strength to do anything about it?*

*"The company is under investigation. Stay tuned for details.*

*"Wilbanks and Associates provided incompetent advice.*

*"Wilbanks and Associates is unethical."*

On July 5, 2001, plaintiffs filed a complaint against Wolk for defamation and unfair business practices, seeking damages and an injunction. Wolk moved to strike the claim for defamation as a SLAPP suit. The court granted Wolk's motion, and awarded Wolk attorney fees and costs in the amount of $7,000.

Plaintiffs appealed.

## DISCUSSION

### I.

### SLAPP Suits, and Legislative Response to SLAPP Suits

The court in *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809 [33 Cal.Rptr.2d 446] (disapproved on other grounds in *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 68, fn. 5 [124 Cal.Rptr.2d 507, 52 P.3d 685]), one of the first cases to apply anti-SLAPP legislation, explained:

"Litigation which has come to be known as SLAPP is defined by the sociologists who coined the term as 'civil lawsuits . . . that are aimed at preventing citizens from exercising their political rights or punishing those who have done so.' (Canan & Pring, Strategic Lawsuits Against Public Participation (1988) 35 Social Problems 506.) The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. [Citations.]

"The favored causes of action in SLAPP suits are defamation, various business torts such as interference with prospective economic advantage,

nuisance and intentional infliction of emotional distress. [Citation.] Plaintiffs in these actions typically ask for damages which would be ruinous to the defendants. [Citations.]

"SLAPP suits are brought to obtain an *economic* advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. [Citations.] Indeed, one of the common characteristics of a SLAPP suit is its lack of merit. [Citation.] But lack of merit is not of concern to the plaintiff because the plaintiff does not expect to succeed in the lawsuit, only to tie up the defendant's resources for a sufficient length of time to accomplish plaintiff's underlying objective. [Citation.] As long as the defendant is forced to devote its time, energy and financial resources to combating the lawsuit its ability to combat the plaintiff in the political arena is substantially diminished. [Citations.] The SLAPP strategy also works even if the matter is already in litigation because the defendant/cross-complainant hopes to drive up the cost of litigation to the point where the plaintiff/cross-defendant will abandon its case or have less resources available to prosecute its action against the defendant/cross-complainant and to deter future litigation. [Citation.]

"Thus, while SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPP's are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so. [Citation.] Because winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions[] suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter SLAPP's. Instead, the SLAPPer considers any damage or sanction award which the SLAPPee might eventually recover as merely a cost of doing business. [Citation.] By the time a SLAPP victim can win a 'SLAPP-back' suit years later the SLAPP plaintiff will probably already have accomplished its underlying objective. Furthermore, retaliation against the SLAPPer may be counter-productive because it ties up the SLAPPee's resources even longer than defending the SLAPP suit itself. [Citations.]" (*Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 815–817, fn. omitted.)

Civil Code section 47, which creates statutory privileges for specified publications or broadcasts, provides some protection from SLAPP suits. Not all communications or conduct leading to SLAPP suits are privileged, however, and while Civil Code section 47 allows a defendant to avoid liability for covered publications or broadcasts, it is not a particularly effective tool for preventing the abuses inherent in SLAPP litigation—the filing of specious suits as a means of causing the defendants to exhaust their resources by defending against the suits.

In 1992, the Legislature enacted Code of Civil Procedure section 425.16 (hereafter section 425.16), finding and declaring that "there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances," and "it is in the public interest to encourage continued participation in matters of public significance, and . . . this participation should not be chilled through abuse of the judicial process." (§ 425.16, subd. (a).)

Under section 425.16, a cause of action asserted "against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue [is] subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).)

The section defines acts "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue," as including: "(1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law; (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law; (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest; (4) or any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

The first category essentially echoes Civil Code section 47, subdivision (b)(1),[2] protecting statements made in official proceedings. The second category goes further, referring to statements made outside of official proceedings but in connection with an issue under consideration in official proceedings, whether or not those statements are themselves privileged.

---

[2] Civil Code section 47, subdivision (b) makes privileged a communication or broadcast made in "any (1) legislative proceeding, (2) judicial proceeding, (3) in any other official proceeding authorized by law, or (4) the initiation or course of any other proceeding authorized by law and reviewable [by writ of mandamus], except . . . [¶] [a]n allegation or averment contained in any pleading or affidavit filed in an action for marital dissolution or legal separation made of or concerning a person by or against whom no affirmative relief is prayed in the action shall not be a privileged publication or broadcast as to the person making the allegation or averment within the meaning of this section unless the pleading is verified or affidavit sworn to, and is made without malice, by one having reasonable and probable cause for believing the truth of the allegation or averment and unless the allegation or averment is material and relevant to the issues in the action."

Statements in this category are subject to a special motion to strike whether or not the issue under consideration is a "public issue." The Legislature, in enacting section 425.16, sought to protect *all* direct petitioning of governmental bodies and petition-related statements and writings. (*Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1120–1121 [81 Cal.Rptr.2d 471, 969 P.2d 564] (*Briggs*).) This broad application of section 425.16 means that meritorious suits will be subject to a special motion to strike; the section reflects the balance struck by the Legislature between the concern for the viability of meritorious lawsuits and the concern of encouraging participation in matters of public significance. (*Briggs, supra,* at p. 1122.)

Unlike the first and second category of statement or conduct protected by section 425.16, the third and fourth categories protect only statements or conduct connected to an issue of public interest. Beyond that requirement, however, these categories are quite broad, applying by their terms to any statements made in a place open to the public or in a public forum, or any conduct engaged in, in furtherance of the rights of petition or free speech.

Section 425.16 does not attempt to distinguish "ordinary lawsuits" from SLAPP suits; i.e., suits brought primarily for the purpose of chilling protected rights of speech or petition. The Supreme Court, accordingly, has held that the plain language of the statute encompasses any action based on protected speech or petitioning activity as defined by the statute, with no requirement that the defendants moving thereunder also prove that the suit was intended to chill their speech. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 734 [3 Cal.Rptr.3d 636, 74 P.3d 737]; citing *Navellier v. Sletten* (2002) 29 Cal.4th 82, 89–95 [124 Cal.Rptr.2d 530, 52 P.3d 703], *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 58, and *City of Cotati v. Cashman* (2002) 29 Cal.4th 69, 75 [124 Cal.Rptr.2d 519, 52 P.3d 695].) It also has recognized the probability that any and all malicious prosecution actions fall within the statute's purview. (*Jarrow Formulas, Inc. v. LaMarche, supra,* 31 Cal.4th at p. 735.) In addition, in response to case law, the Legislature added to section 425.16 the proviso that it "shall be construed broadly." (§ 425.16, subd. (a) as amended by Stats. 1997, ch. 271, § 1; Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended May 12, 1997, p. 4.) In sum, "[w]henever possible, [the courts] should interpret the First Amendment and section 425.16 in a manner 'favorable to the exercise of freedom of speech, not to its curtailment.' " (*Briggs, supra,* 19 Cal.4th 1106, 1119.)[3]

---

[3] The disapproved case law on this point includes *Zhao v. Wong* (1996) 48 Cal.App.4th 1114, 1122 [55 Cal.Rptr.2d 909], where we construed the statute narrowly, to safeguard activities protected by the petition clause. (*Id.* at p. 1125.)

## II.

### Procedure Under Section 425.16, and Standard of Review

"The moving party bears the initial burden of establishing a prima facie showing the plaintiff's cause of action *arises* from the defendant's free speech or petition activity. [Citation.] . . . If the defendant establishes a prima facie case, then the burden shifts to the plaintiff to establish ' "a probability that the plaintiff will prevail on the claim," ' i.e., 'make a prima facie showing of facts which would, if proved at trial, support a judgment in plaintiff's favor.' [Citation.] In making its determination, the trial court is required to consider the pleadings and the supporting and opposing affidavits stating the facts upon which the liability or defense is based. (§ 425.16, subd. (b).) Discovery is stayed upon the filing of the motion. (§ 425.16, subd. (g).) However, upon noticed motion and for good cause shown, the court may allow specified discovery." (*Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 646–647 [49 Cal.Rptr.2d 620], overruled on other grounds in *Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th at p. 68, fn. 5.)

■ We review the record independently to determine whether the asserted cause of action arises from the defendant's free speech or petition activity, and, if so, whether the plaintiff has shown a probability of prevailing. (*ComputerXpress, Inc. v. Jackson* (2001) 93 Cal.App.4th 993, 999 [113 Cal.Rptr.2d 625] (*Computer Xpress*).)

## III.

### Application of Section 425.16 to Plaintiffs' Causes of Action

Plaintiffs contend, and we agree, that this is not by any means the prototypical SLAPP suit. Plaintiffs are not a large private interest, and Wolk, although certainly a consumer advocate, derives economic advantages from her advocacy by promoting her books on her Web site. There is no reason to suppose that plaintiffs filed this lawsuit to force Wolk to exhaust her resources in litigation. Rather, the evidence is that plaintiffs legitimately sought to protect their names and reputations, filing suit only after Wolk refused to publish their side of the story. Nonetheless, as discussed above, section 425.16, although enacted in response to SLAPP litigation, is to be broadly interpreted. It can and does apply to suits bearing very little relationship to SLAPP litigation, and we conclude that, through section 425.16, subdivisions (e)(3) and (e)(4), it applies here.

## A. *Public Forum*

Wolk's statements are published in her Web site on the Internet, meaning that they are accessible to anyone who chooses to visit her Web site. As a result, her statements hardly could be more public. The Internet "provides relatively unlimited, low-cost capacity for communication of all kinds. . . . This dynamic, multifaceted category of communication includes not only traditional print and news services, but also audio, video, and still images, as well as interactive, real-time dialogue. Through the use of chat rooms, any person with a phone line can become a town crier with a voice that resonates farther than it could from any soapbox. Through the use of Web pages, mail exploders, and newsgroups, the same individual can become a pamphleteer." (*Reno v. American Civil Liberties Union* (1997) 521 U.S. 844, 870 [138 L.Ed.2d 874, 117 S.Ct. 2329].) The court in *ComputerXpress, supra*, 93 Cal.App.4th 993, 1007, accordingly held that disparaging remarks made on Web sites were made in a public forum when the evidence showed that the Web sites were accessible free of charge to any member of the public and persons who chose to do so could post their own opinions there.

Plaintiffs contend that Wolk's Web site is not a true public forum because, unlike the Web sites in *ComputerXpress, supra*, 93 Cal.App.4th 993, which accepted postings from anyone, Wolk controls her site, and does not post information or opinions from other sources. This contention is supported in part by case law finding or suggesting that a newsletter or newspaper is not a public forum if its contents are controlled. In *Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 863, footnote 5 [44 Cal.Rptr.2d 46], for example, the court, in dicta, questioned whether a private newspaper might be considered a public forum: "No authorities have been cited to us holding a newspaper printing allegedly libelous material is a 'place open to the public or a public forum.' Newspaper editors or publishers customarily retain the final authority on what their newspapers will publish in letters to the editor, editorial pages, and even news articles, resulting at best in a controlled forum not an uninhibited 'public forum.' " In *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1130–1131 [2 Cal.Rptr.3d 385], similarly, the court concluded that a trade newsletter is not a public forum: "A public forum is a place open to the use of the general public ' "for purposes of assembly, communicating thoughts between citizens, and discussing public questions." ' [Citations.] Means of communication where access is selective, such as most newspapers, newsletters, and other media outlets, are not public forums. [Citation.] Some of the statements of which plaintiff complains were printed in [the trade newsletter]. There is nothing in the record to establish [the newsletter] is sufficiently open to general public access to be considered a public forum."

The court in *Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468 [102 Cal.Rptr.2d 205] (*Damon*) reached a different conclusion on the facts before it. The court was concerned with statements published by the Village Voice, a private homeowners association club newsletter. In deciding whether the private newsletter was a public forum, the court assumed for purposes of argument that the newsletter was in essence the mouthpiece for a small group of homeowners who generally would not permit contrary viewpoints to be published in the newsletter.

The *Damon* court held: "Even assuming the record supports this characterization, these facts do not take the publication outside of the anti-SLAPP statutory protection. First, numerous courts have broadly construed section 425.16, subdivision (e)(3)'s 'public forum' requirement to include publications with a single viewpoint. [Citations.] [¶] We agree with this approach. The Village Voice was a public forum in the sense that it was a vehicle for communicating a message about public matters to a large and interested community. All interested parties had full opportunity to read the articles in the newsletter. Although the Village Voice newsletter may not have offered a 'balanced' view, the Association's other newsletter . . . was the place where Association members with differing viewpoints could express their opposing views. It is in this marketplace of ideas that the Village Voice served a very public communicative purpose promoting open discussion—a purpose analogous to a public forum. Given the mandate that we broadly construe the anti-SLAPP statute, a single publication does not lose its 'public forum' character merely because it does not provide a balanced point of view. [¶] This construction comports with the fundamental purpose underlying the anti-SLAPP statute, which seeks to protect against 'lawsuits brought primarily to chill the valid exercise of constitutional rights' and 'abuse of the judicial process . . . .' (§ 425.16, subd. (a).) This purpose would not be served if we were to construe the statute to make section 425.16, subdivision (e)(3) inapplicable to all newspapers, magazines, and other public media merely because the publication is arguably 'one-sided.' This is particularly true because section 425.16, subdivision (e)(3) requires not only that the statement be made in a public forum, but also that it concern an issue of public interest. Further, because section 425.16, subdivision (e)(4) includes *conduct* in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged, it would be anomalous to interpret section 425.16, subdivision (e)(3) as imposing that requirement merely because the challenged speech is an oral or written statement." (*Damon, supra,* 85 Cal.App.4th at pp. 476–477.)

These somewhat differing views can be reconciled, at least in part, by recognizing that under some circumstances the relevant forum is limited to a single source of information, while in other circumstances the forum will include several or many sources of information. In our view, whether a

statement is "made in a place open to the public or in a public forum" depends on whether the means of communicating the statement permits open debate. We agree that Wolk's Web site—and most newspapers—are not public forums in and of themselves. It does not follow, however, that statements made on a Web site or in a newspaper are not made in a public forum. Where the newspaper is but one source of information on an issue, and other sources are easily accessible to interested persons, the newspaper is but one source of information in a larger public forum.

■ In a sense, the Web, as a whole, can be analogized to a public bulletin board. A public bulletin board does not lose its character as a public forum simply because each statement posted there expresses only the views of the person writing that statement. It is public because it posts statements that can be read by anyone who is interested, and because others who choose to do so can post a message through the same medium that interested persons can read. Here, while Wolk controls her Web site, she does not control the Web. Others can create their own Web sites or publish letters or articles through the same medium, making their information and beliefs accessible to anyone interested in the topics discussed in Wolk's Web site.

We conclude, therefore, that Wolk's statements were made in a public forum.

■ In addition, as the court in *Damon, supra,* 85 Cal.App.4th 468, noted, section 425.16, subdivision (e)(4) includes *conduct* in furtherance of free speech rights, regardless whether that conduct occurs in a place where ideas are freely exchanged. Section 425.16, therefore, governs even private communications, so long as they concern a public issue. (*Averill v. Superior Court* (1996) 42 Cal.App.4th 1170 [50 Cal.Rptr.2d 62].)[4] It follows that even if Wolk's communications were not made in a public forum, and therefore do

---

[4] *Averill* was decided before the Legislature added subdivision (e)(4) to section 425.16, but lends support to the supposition that subdivision (e)(4) is intended to cover private communications on public issues. In *Averill,* the defendant, who opposed a plan by a charitable organization to locate a battered women's shelter in her neighborhood, expressed to her employer her opposition to the plan and her belief that the employer should not support the organization as a Christmas charity. The organization sued her for slander. The court noted that in specifying what constitutes "acts in furtherance of a person's right [of petition or] free speech," subdivision (e) uses the word "includes." The court concluded that the Legislature intended the statute to have broad application, and held that even private conversations on public issues were covered, citing "the stated purpose of the statute, which includes protection of not only the constitutional right to 'petition for the redress of grievances,' but the broader constitutional right of freedom of speech." (*Averill v. Superior Court, supra,* 42 Cal.App.4th at pp. 1175–1176.) The Legislature responded to this holding by amending section 425.16 to express its intent that the section be broadly applied and by adding the fourth category of protected activity to subdivision (e).

not fall under section 425.16, subdivision (e)(3), they fall under subdivision (e)(4).

B. *Issue of Public Interest*

■ Of course, not all statements made in a public forum, and not all conduct in furtherance of the rights of petition or free speech, fall under section 425.16, subdivision (e)(3) or (e)(4). Both categories are limited by the requirement that the statement or conduct be connected with an issue of public interest—a limitation that, among other things, means that in many cases the statement or conduct will be a part of a public debate and the public therefore will be exposed to varying viewpoints on the issue.

■ The most commonly articulated definitions of "statements made in connection with a public issue" focus on whether (1) the subject of the statement or activity precipitating the claim was a person or entity in the public eye; (2) the statement or activity precipitating the claim involved conduct that could affect large numbers of people beyond the direct partici- pants; and (3) whether the statement or activity precipitating the claim involved a topic of widespread public interest. (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 33 [1 Cal.Rptr.3d 390]; *Rivero v. American Federation of State, County and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 924 [130 Cal.Rptr.2d 81] (*Rivero*).) As to the latter, it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner itself contribute to the public debate. (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107 [1 Cal.Rptr.3d 501] (*Du Charme*) [report that an employee was removed for financial mismanagement was informational, but not connected to any discussion, debate or controversy]; *Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601 [132 Cal.Rptr.2d 191] [advertisements about a pill offering a natural alternative to breast implants are not about the general topic of herbal supplements]; *Rivero, supra,* 105 Cal.App.4th at p. 924 [reports that a particular supervisor was fired after union members complained of his activities are not a discussion of policies against unlawful workplace activities].)

■ Wolk's comments on plaintiffs' business practices do not meet these criteria, as plaintiffs are not in the public eye, their business practices do not affect a large number of people and their business practices are not, in and of themselves, a topic of widespread public interest. Consumer information, however, at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest. *Paradise Hills Associates v. Procel* (1991) 235 Cal.App.3d 1528 [1

Cal.Rptr.2d 514], although not itself a section 425.16 case, noted that the First Amendment protected a consumer's statements about the quality of a seller's products and service and her unhappiness with them, finding, in part, that the statements concerned a matter of public interest. "Courts have recognized the importance of the public's access to consumer information. 'The growth of "consumerism" in the United States is a matter of common knowledge. Members of the public have recognized their roles as consumers and through concerted activities, both private and public, have attempted to improve their . . . positions vis-à-vis the supplies [sic] and manufacturers of consumer goods. They clearly have an interest in matters which affect their roles as consumers, and peaceful activities, such as plaintiffs', which inform them about such matters are protected by the First Amendment.' [Citation.]" (*Id.* at p. 1544; and see *Commonwealth Energy Corp. v. Investor Data Exchange, Inc., supra,* 110 Cal.App.4th 26, 34, citing *Paradise Hills Associates v. Procel, supra,* 235 Cal.App.3d 1528, on this point in connection with a special motion to strike brought under section 425.16.)

In *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562 [92 Cal.Rptr.2d 755], the plaintiffs alleged that a manufacturer of Coumadin, an anticoagulant medication, had made false statements about the drug. The court found that these statements met the public issue requirement, noting allegations that the drug was used by more than 1.8 million Americans for the prevention and treatment of life-threatening conditions. (*Id.* at p. 567.) *ComputerXpress, supra,* 93 Cal.App.4th 993, concerned disparaging remarks about a company selling computer-related products to the public. The court found that the public issue requirement was met, noting evidence suggesting that the company had a large number of shareholders, allegations that the postings had caused it to lose $10 million as a result of the failure of potential customers to purchase its stock and evidence that the company had promoted itself through press releases. (*Id.* at p. 1008.)

Here, it appears that the viatical industry touches a large number of persons, both those who sell their insurance policies and those who invest in viatical settlements. According to plaintiffs, their own business generated an average monthly income of $58,333 before Wolk's statements about them appeared on her Web site—and plaintiffs are but one of many brokers. It is undisputed that Wolk has studied the industry, has written books on it, and that her Web site provides consumer information about it, including educating consumers about the potential for fraud. As relevant here, Wolk identifies the brokers she believes have engaged in unethical or questionable practices, and provides information for the purpose of aiding viators and investors to choose between brokers. The information provided by Wolk on this topic, including the statements at issue here, was more than a report of some earlier conduct or proceeding; it was consumer protection information.

■ That the information provided here is in the nature of consumer protection information distinguishes this case from others recognizing that a publication does not become connected with an issue in the public interest simply because it is widely disseminated, or because it can be used as an example of bad practices or of how to combat bad practices.[5] The statements made by Wolk were not simply a report of one broker's business practices, of interest only to that broker and to those who had been affected by those practices. Wolk's statements were a warning not to use plaintiffs' services. In the context of information ostensibly provided to aid consumers choosing among brokers, the statements, therefore, were directly connected to an issue of public concern.[6]

---

[5] In *Rivero, supra*, 105 Cal.App.4th 913, for example, a union reported that a supervisor had been terminated for unlawful workplace activity. The court held that the termination of the supervisor did not rise to the level of a public issue, and could not become a public issue simply because the reports were widely disseminated to union members. "If the mere publication of information in a union newsletter distributed to its numerous members were sufficient to make that information a matter of public interest, the public-issue limitation would be substantially eroded, thus seriously undercutting the obvious goal of the Legislature that the public-issue requirement have a limiting effect." (*Id.* at p. 926.) The court did not find it persuasive that the information could be used as an example of workplace abuses or to show how employees could take steps to stop misconduct. "[I]nformation that can be used as an example or as a motivator is not the same as information that has intrinsic value to others." (*Id.* at p. 925.)

A similar conclusion was reached in *Du Charme, supra*, 110 Cal.App.4th 107, concerning allegedly defamatory statements made on a union's Web site about an employee's termination. The statements, although undoubtedly of interest to the membership, were unconnected to any discussion, debate or controversy, and thus unconnected to any matter of public interest. The court, after surveying the cases, held "that in order to satisfy the public issue/issue of public interest requirement of . . . subdivision (e)(3) and (4) of the anti-SLAPP statute, in cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Id.* at p. 119.)

[6] *Weinberg v. Feisel, supra*, 110 Cal.App.4th 1122, probably is the case most helpful to plaintiffs' position. The parties in that case were aficionados of token collecting. The defendant believed that the plaintiff had stolen a token from him while at a token show, and began a campaign against the plaintiff that included letters to other collectors accusing plaintiff of the theft, and advertisements in a club newsletter describing the theft, although not naming the plaintiff as the thief. The court found that the defendant's communications were published to a limited number of persons and concerned only a private dispute, and, therefore, were not connected to an issue in the public interest, even though they accused the plaintiff of criminal activity. (*Id.* at pp. 1132, 1134.) The court did not consider whether the publications might have been a kind of warning to consumers, alerting other token collectors to the perils of dealing with the defendant. In any event, the situation there is distinguishable from the situation here in that the defendant's accusations were not part of a general broadcast, but were made only to a few collectors, and the defendant's purpose appears to have been an attempt to exact a personal revenge on the plaintiff by causing him to be ostracized from the token collector community.

We conclude, therefore, that plaintiffs' claims arose from statements made in connection with an issue in the public interest, and that Wolk, therefore, met the burden imposed on her by section 425.16.

C. *Probability That the Plaintiffs Will Prevail*

As Wolk met her burden, the burden shifted to plaintiffs to establish a probability that they would prevail on their claims. (§ 425.16, subd. (b)(1); *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 808–809 [119 Cal.Rptr.2d 108] (*Seelig*).) A plaintiff's burden under section 425.16 " 'is similar to the standard used in determining motions for nonsuit, directed verdict, or summary judgment.' " The plaintiff is required to demonstrate that the complaint is legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the plaintiff's evidence is credited. (*Seelig,* at p. 809.) The court considers the pleadings and the supporting and opposing affidavits stating facts on which the liability or defense is based, and the motion to strike should be granted if, as a matter of law, the properly pleaded facts do not support a claim for relief. (*Ibid.*)

Defamation consists of, among other things, a false and unprivileged publication, which has a tendency to injure a party in its occupation. (Civ. Code, § 45; *Rothman v. Jackson* (1996) 49 Cal.App.4th 1134, 1140 [57 Cal.Rptr.2d 284].)

To reiterate, plaintiffs alleged that they were defamed by the following statements that appeared on Wolk's Web site: *"Be very careful when dealing with this broker. Wilbanks and Assoc. is under investigation by the CA dept. of insurance. The complaint originated with a California viator who won a judgment against Wilbanks. How many others have been injured but didn't have the strength to do anything about it?*

*"The company is under investigation. Stay tuned for details.*

*"Wilbanks and Associates provided incompetent advice.*

*"Wilbanks and Associates is unethical."*

There is evidence that Wolk's publication contained some truths. A viator had obtained a small claims court judgment against plaintiffs, and had complained about them to the California Department of Insurance, which had responded by opening a file and assigning an investigator to the matter. That a publication states a truth, however, does not insulate the

publication as a whole from a claim of defamation. It also is not determinative that Wolk's publication asked a rhetorical question. The ultimate question is whether a reasonable trier of fact could conclude that the published statements imply a provably false factual assertion. (*Seelig, supra,* 97 Cal.App.4th 798, 809.)

As we found in *Weller v. American Broadcasting Companies, Inc.* (1991) 232 Cal.App.3d 991 [283 Cal.Rptr. 644], the court "must determine whether the statements that form the basis of a defamation claim: (1) expressly or impliedly assert a fact that is susceptible to being proved false; and (2) whether the language and tenor is such that it cannot ' "reasonably [be] interpreted as stating actual facts." ' " (*Id.* at p. 1001, citing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 20 [111 L.Ed.2d 1, 110 S.Ct. 2695].) For similar reasons, couching an assertion in the form of a conjecture does not, in and of itself, entitle the assertion to constitutional protection. (*Weller v. American Broadcasting Companies, Inc., supra,* 232 Cal.App.3d at pp. 1003–1004.) And while constitutional protection has been accorded " 'rhetorical hyperbole,' 'vigorous epithet[s],' 'lusty and imaginative expression[s] of . . . contempt,' and language used 'in a loose, figurative sense' " (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [88 Cal.Rptr.2d 843]); see also *Seelig, supra,* 97 Cal.App.4th at p. 809, such communications may be actionable if they convey false and defamatory information.

Wolk's alleged statements were not limited to reports that a viator obtained a judgment against plaintiffs, or that the Department of Insurance had initiated an investigation of the viator's complaint. They include express assertions that plaintiffs provided incompetent advice and engaged in unethical business practices. A person reading Wolk's statements reasonably could conclude that Wolk was aware not only of the judgment and investigation, but of the facts underlying them, and had concluded that they demonstrated incompetence and a lack of ethics.

Indeed, even without the express assertions of incompetence or lack of ethics, Wolk's publication suggests a knowledge that plaintiffs engaged in unethical or incompetent practices leading to a judgment and to an investigation by the Department of Insurance. In context, a reader considering the question, "How many others have been injured but didn't have the strength to do anything about it?" reasonably could understand the question to be a positive assertion that plaintiffs prey on persons whose age or illness rendered them unable to protect themselves.

It also is not determinative that the express and/or implied assertions of incompetent and unethical business practices could be viewed as statements of opinion. A statement of opinion may be actionable if it implies

the allegation of undisclosed defamatory facts as the basis for the opinion. "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications . . . ." (*Milkovich v. Lorain Journal Co., supra,* 497 U.S. at pp. 18–19; see *Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1181 [96 Cal.Rptr.2d 136].)

This point has application here, where Wolk's report omitted significant facts. While it does appear that a viator won a judgment against plaintiffs, Wolk did not report that the judgment was entered in the small claims court. Wolk did not disclose the nature of the viator's grievance, whether plaintiffs appeared, or if they by some means attempted, unsuccessfully, to defend themselves from the viator's suit. That a judgment was entered against plaintiffs in the small claims court certainly shows that a viator had a grievance against plaintiffs, but it does not carry the same suggestion of malfeasance that attends a report of a judgment entered on a fully contested matter in the trial court. By omitting the forum, therefore, Wolk allowed readers to assume the worst, when it is possible that plaintiffs simply decided not to defend the matter, irrespective of its merits.

Wolk's report of the Department of Insurance investigation similarly omits potentially significant facts. In support of the special motion to strike, Wolk declared that she had been informed by the viator who won the judgment that he had filed a complaint about plaintiffs with the department. She called the department, and was informed that it investigates all complaints that are made. She was given the name of the person in charge of the investigation and was given the investigation case number. Wolk later learned that the department did not pursue the case "due to an overwhelming backlog of investigations related to supervision of more than 4,000 insurance agents," after which she "immediately changed [her] site to reflect this."

By omitting the facts that the Department of Insurance investigates every complaint, Wolk suggested that the department had formed an opinion that the viator's claim was worthy of investigation. The department's failure to pursue the investigation suggests the contrary, even though that failure may have been due, at least in part, to the large number of claims filed with the department and the lack of sufficient personnel to handle them all.

The actual facts therefore show only that a disgruntled viator contacted the department. Wolk's assertions, in context, suggest that the department had formed the opinion that the viator's claims had validity.

 Wolk's own position as a crusader and watchdog to the industry also works against any argument that she was merely stating the facts and drawing her own opinion from them. An accusation that, if made by a layperson, might constitute opinion may be understood as being based on fact if made by someone with specialized knowledge of the industry. (*Slaughter v. Friedman* (1982) 32 Cal.3d 149, 154 [185 Cal.Rptr. 244, 649 P.2d 886].) Wolk here held herself out to have special knowledge resulting from extensive research into the viatical industry; i.e., she claimed to be a person who could recognize and identify unethical practices that the average person might not recognize. Wolk clearly expected readers to rely on her opinions as reflecting the truth.[7]

We conclude, therefore, that Wolk's publication reasonably can be construed as asserting as fact that plaintiffs had engaged in specific wrongful conduct leading to a judgment and an investigation, and that plaintiffs engaged in incompetent and unethical business practices, taking advantage of persons unable to defend themselves.

We conclude, further, that the facts implied by the publication as a whole are provably false. While the existence of the judgment is true, plaintiffs may be able to show that it does not establish that they engaged in incompetent or unethical business practices. Plaintiffs also may be able to show that their business practices in fact were fair, honest and competent, and that they suffered actual damages as a result of the publication. Plaintiffs declared that their business practices conformed to accepted standards of ethics and complied with the law. They never had been under actual investigation by the Department of Insurance, and never had been contacted by the department about a viator's complaints. Scott Wilbanks declared that he telephoned Wolk when he learned of the publication to ask her to print plaintiffs' side of the story, that she refused to discuss the allegations and hung up on him. Plaintiffs claimed damages in the amount of $1,080,667 in lost income through January 2002, which sum they determined, in part, by calculating their average monthly income for the year prior to Wolk's publication.

Wolk contends that her statements are protected by Civil Code section 47, subdivision (d)(1), making privileged a publication made by a fair and true report in, or a communication to, a public journal, of a judicial or other public official proceeding of a verified charge or complaint made by any

---

[7] Wolk cites *Dodds v. American Broadcasting Co.* (9th Cir. 1998) 145 F.3d 1053, 1067–1068, and *Standing Committee v. Yagman* (9th Cir. 1995) 55 F.3d 1430, 1439, for the proposition that there can be no liability when the publisher reveals the facts upon which an opinion is based. This proposition may have validity when the publisher reveals all relevant facts, the publication does not suggest that the publisher's own opinion is based in part on facts known only to her, and the publisher has no expertise beyond that of the average reader. It has no application here.

person to a public official, upon which complaint a warrant has been issued. Assuming, for purposes of argument, that Wolk's private Web site is a public journal, Wolk's statements were more than a fair and true report of an official proceeding; they were express and implied assertions that plaintiffs' business practices were incompetent and unethical. Civil Code section 47, subdivision (d) does not protect Wolk from liability for those assertions.

Wolk also contends that should the matter go to trial, it is not probable plaintiffs will be able to show that she in fact published the express statements that plaintiffs provided incompetent advice and engaged in unethical business practices. (Wolk declared that she did not recall writing that "Wilbanks & Associates provided incompetent advice" or that "Wilbanks & Associates is unethical," although it is her subjective opinion that both statements are true.) Wolk further claims that plaintiffs have not produced sufficient evidence that they actually were damaged by Wolk's publication and that the evidence produced by them cannot support a finding that Wolk acted negligently, let alone that she acted with malice.

Wolk's argument assumes that a court ruling on a special motion to strike has the power to weigh the evidence. Such a procedure would be subject to constitutional attack as allowing the court to weigh and adjudicate factual disputes in violation of the jury clause of the California Constitution. (Cal. Const., art. I, § 16.) Statutes such as section 425.16, therefore, are construed to require the lower court to consider the challenged plaintiff's affidavits for the purpose of determining whether sufficient evidence has been presented to demonstrate a prima facie case and, " '[i]n making this judgment, the trial court's consideration of the defendant's opposing affidavits does not permit a weighing of them against plaintiff's supporting evidence, but only a determination that they do not, *as a matter of law*, defeat that evidence.' [Citation.]" (*Lafayette Morehouse v. Chronicle Publishing Co.*, *supra*, 37 Cal.App.4th at p. 867.) A motion to strike under section 425.16 is not a substitute for a motion for a demurrer or summary judgment (*Lam v. Ngo* (2001) 91 Cal.App.4th 832, 851, fn. 12 [111 Cal.Rptr.2d 582].) In resisting such a motion, the plaintiff need not produce evidence that he or she can recover on every possible point urged. It is enough that the plaintiff demonstrates that the suit is viable, so that the court should deny the special motion to strike and allow the case to go forward.

Wolk's evidence does not, as a matter of law, defeat plaintiffs' evidence that she expressly asserted that plaintiffs were incompetent and engaged in unethical business practices. In any event, as we have found that even without the express assertions, the publication implies incompetence and a lack of ethics, plaintiffs can prevail even if they are unable to convince the finder of fact that the alleged express statements were published. Plaintiffs, by

asserting loss of income and a means of calculating lost income, produced sufficient evidence from which it may be concluded that they suffered actual damages as a result of Wolk's publication.

Plaintiffs' evidence also allows an inference that Wolk acted at least negligently, and quite possibly with a reckless disregard for the truth. It appears that Wolk did not check with plaintiffs before publishing the material. She knew that the judgment was in the small claims court. She apparently knew that the Department of Insurance would investigate any complaint submitted to it, and therefore was aware that an investigation by the department did not establish that the complaint had validity. Wolk's refusal to discuss the viator's claim with Wilbanks could be viewed as demonstrating a lack of interest in the truth.

Plaintiffs were not required to prove malice. Wolk points out, correctly, that a private individual cannot recover presumed or punitive damages in a defamation action without proving malice (*Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 747 [257 Cal.Rptr. 708, 771 P.2d 406]; *Melaleuca, Inc. v. Clark* (1998) 66 Cal.App.4th 1344, 1360 [78 Cal.Rptr.2d 627]), and that malice must be shown by "clear and convincing" proof. (*Bose Corp. v. Consumers Union of U.S., Inc.* (1984) 466 U.S. 485, 511, fn. 30 [80 L.Ed.2d 502, 104 S.Ct. 1949]; *Brown v. Kelly Broadcasting Co., supra,* at p. 747.) Here, plaintiffs were not relying on a theory of presumed damages. They stated a theory of actual compensatory damages, and provided evidence supporting that theory. In short, they made a sufficient showing that they could recover on their claim for defamation against Wolk. Plaintiffs adequately established a probability of prevailing on their claim against Wolk even if they did not demonstrate the ability to recover every element of damages sought on that claim. An anti-SLAPP-suit motion is not a vehicle for testing the strength of a plaintiff's case, or the ability of a plaintiff, so early in the proceedings, to produce evidence supporting each theory of damages asserted in connection with the plaintiff's claims. It is a vehicle for determining whether a plaintiff, through a showing of minimal merit, has stated and substantiated a legally sufficient claim. (*Equilon Enterprises v. Consumer Cause, Inc., supra,* 29 Cal.4th 53, 63; *Navellier v. Sletten, supra,* 29 Cal.4th 82, 95.)

Finally, we decline to find that the "single-publication rule" (Civ. Code, § 3425.3) defeats plaintiffs' claims. Wolk raised the rule for the first time during oral argument, noting that the recently decided case of *Traditional Cat Assn., Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392 [13 Cal.Rptr.3d 353] applied the rule to statements published on the Internet. In essence, the rule holds that a cause of action for defamation accrues on the first general distribution of the publication to the public. (*Id.* at p. 401, citing *Belli v.*

*Roberts Brothers Furs* (1966) 240 Cal.App.2d 284, 289 [49 Cal.Rptr. 625].) The rule is qualified in that the repetition of the defamatory statement, such as in a new edition of a book or newspaper, may give rise to a new cause of action with a new accrual date. (*Traditional Cat,* at p. 401.)

It is undisputed that Wolk first began publishing statements about plaintiffs in 1998. Since plaintiffs filed their complaint on July 1, 2001, more than one year later, Wolk contends that the single-publication rule bars plaintiffs' action as a matter of law.

Plaintiffs' complaint alleged that Wolk's injurious statements were made "within one year past." In responding to the motion to dismiss, plaintiffs asserted that Wolk's stories changed over time, but that the statements at issue here "were present on or after July 5, 2000." It is undisputed that Wolk has altered her statements from time to time. Plaintiffs claim that the evidence therefore allows the inference that Wolk effectively published a "new edition" of her Web site within one year of their complaint such that their action accrued within the applicable one-year limitations period.

For us to hold that the single-publication rule bars plaintiffs' claims, we would have to adopt the reasoning in *Traditional Cat Assn., Inc. v. Gilbreath, supra,* 118 Cal.App.4th 392, which applies settled law to a new and not perfectly analogous setting, and may not reflect the final statement of the law on the issue. We also would have to conclude that plaintiffs' evidence does not support a finding that Wolk altered her words during the year before the complaint was filed or, at least, that her alterations did not rise to the level of a "new edition." Finally, we would have to conclude that plaintiffs should not be permitted to go forward because they failed to make a factual showing sufficient to disprove a defense that was not raised by Wolk until late in the appellate process. We decline to do so, choosing instead to apply the appellate rule that, ordinarily, a defendant's failure to plead and prove a defense in the trial court precludes the defendant from raising the defense in the appellate court. (*Lucich v. City of Oakland* (1993) 19 Cal.App.4th 494, 498 [23 Cal. Rptr. 2d 450].) Our ruling here should not be viewed as preventing Wolk from raising the single-publication rule as a defense below, where the parties will have the ability to address the defense fully, and produce such evidence as they have in support or opposition to it.

We conclude that plaintiffs here made a sufficient showing of a probability of prevailing. The trial court, therefore, erred in granting the special motion to strike and awarding Wolk attorney fees.

## DISPOSITION

The order granting the special motion to strike and awarding attorney fees to Wolk is reversed. Plaintiffs are awarded their costs on appeal.

Swager, J., and Margulies, J., concurred.