Filed 9/3/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WOODHILL VENTURES, LLC, | B305797 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. 19BBCV00929) |
| v. | |
| BEN YANG, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, John J. Kralik, Judge. Affirmed.

The Cochran Firm – California and James A. Bryant for Defendant and Appellant.

Shumener, Odson & Oh, Robert Odson and Benjamin P. Sosnick for Plaintiff and Respondent.

_____

This case is about a birthday cake. Self-proclaimed celebrity jeweler Ben "the Baller" Yang threw a birthday party for his seven-year-old son. His wife, Nicolette Yang, ordered a themed cake from Big Sugar Bakeshop. She sent a picture showing her idea. But when the cake arrived, the Yangs, to their dismay, saw it had realistic-looking pills made of fondant, an edible icing. The Yangs thought these cake decorations looked too much like real medications. Yang called the bakery to complain and, dissatisfied with the bakery's response, aired his grievance to his 1.5 million social media followers. He also discussed his experience on his podcast two days later. Big Sugar began receiving death threats and negative reviews from Yang's followers. Big Sugar demanded Yang correct what it said were false statements about the bakery. Yang refused. Big Sugar filed suit alleging libel, slander, and violation of the Unfair Competition Law. Yang responded with a special motion to strike. The trial court denied Yang's motion. We affirm because Yang's statements about a bakery order did not involve the public interest.

I

We recount the background.

A

Nicolette Yang contacted Big Sugar to make her son's birthday cake. Her theme idea was a "modern Mad Science Birthday Party." She gave the bakery a picture of what she had in mind. The record contains this picture. (See appendix A, *post*, p. 18.)

Yang's picture shows a knocked-over beaker atop a cake. Spilling from the beaker are little balls or pill-like objects. Around the base are small oval oblongs the Yangs later would

claim are jelly beans.  On the cake's side is a joke periodic table element labelled "slime."  Continuing the mad science theme are hexagons and lines suggesting a skeletal formula.

Big Sugar responded with an invoice describing each cake component and its corresponding cost, including "Pills-$15."  Nicolette Yang wrote, "Okay sounds great!" and asked to change the frosting color.  Big Sugar amended the invoice and re-sent; it still included "Pills-$15."

The parties disagree whether Nicolette Yang mentioned the cake was for her young son during a visit to the bakery.  She said she did.  The Big Sugar employee said no.

On the day of the party, Big Sugar delivered the cake to the Yangs' home.  (See appendix B, *post*, p. 19.)

The Yangs were shocked the pills made of icing looked so realistic.

What happened next again is in dispute.

Yang's version goes like this.  He called the bakery to demand an apology and a refund.  He expressed shock they put drugs on a seven year old's cake.  The woman at the bakery responded rudely, blamed Nicolette Yang, and claimed they believed the cake was for a pharmacy school graduate and did not know it was for a child's birthday.  Then the woman hung up on Yang.  Yang called back and the bakery put him on hold.  He hung up, then called back a third time to express disgust with the cake's appearance and the bakery's response.

Big Sugar recounts the calls differently.  According to Big Sugar's employees, Yang called and said they had put drugs on a cake for a seven year old and that he had a TV show, a podcast, and over a million followers who would destroy Big Sugar.  Then he hung up.  He called back and told a second employee to "put

that fucking bitch on the phone," but he hung up before the first employee could get to the phone. Yang called a third time and again threatened to destroy Big Sugar, mentioning his social media followers and his podcast.

Big Sugar called the Yangs to attempt to resolve the issue. Big Sugar also began baking a replacement cake because the party was still a few hours away. Big Sugar employees delivered the second cake to the Yangs.

Within minutes of Yang's calls to Big Sugar, he began posting about the cake on social media. His posts on Instagram included these statements.

- "WE GONNA MAKE @BIGSUGARBAKESHOP FEEL IT";
- "Welp @bigsugarbakeshop you fucked up royally and now you guys are legit canceled. And you fucked up my sons [*sic*] bday cake. So I'll make sure nobody I know or who knows me ever does business with idiots such as your business";
- "Anyone in their even high mind would know that you should NEVER EVER PUT DRUGS ON A 7 year old kids [*sic*] bday cake!"

On Twitter, he posted, "This place called @BigSugarBakeshp [*sic*] in studio city CA super fucked up on my sons [*sic*] bday cake. Instead of jelly beans they put RX prescription pills on my 7 year olds [*sic*] bday cake." Yang posted pictures of the sample sent to Big Sugar and the cake Big Sugar delivered. He also posted: "If they offered it and was [*sic*] apologetic about it. We would [*sic*] even be here bruh. Instead they threw the blame on my wife and hung up on me and acted like bitches."

Two days later, Yang described the incident on his podcast.

Shortly after Yang's initial social media posts, Big Sugar began receiving calls from Yang's followers, upset that Big Sugar had put prescription pills on a child's cake. Callers threatened to "fuck up" the employees, said the employees should be killed, and claimed to have called the police and health department about Big Sugar's conduct. Yang's followers conveyed similar messages to Big Sugar via Instagram and Twitter. Many people wrote they would not, or would no longer, patronize Big Sugar.

Big Sugar notified Yang via Twitter of the messages and threats it was receiving. He responded, "Man stop trying to play the victim. . . . Damage done. Bye." Big Sugar, through counsel, served Yang with a demand to correct or retract what it alleged were false statements. Yang did not correct or retract.

B

Big Sugar filed suit, alleging causes of action for libel (Civ. Code, §§ 45 & 45a), slander (Civ. Code, § 46), and violation of the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.). Big Sugar challenged nine statements from Yang's social media posts and podcast. We italicize the challenged statements:

1. Twitter: "*This place called @BigSugarBakeshp* [sic] *in studio city CA super fucked up on my sons* [sic] *bday cake. Instead of jelly beans they put RX prescription pills on my 7 year olds* [sic] *bday cake* [emoji]. It's a science themed party. . . . *YOU ARE CANCELLED!!!*"

2. Instagram story: "*Anyone in their even high mind would know that you should NEVER EVER PUT DRUGS ON A 7 year old kids* [sic] *bday cake! Why? Why would @bigsugarbakeshop do something so*

5

*stupid?* Did you want the kids attending the party to think it's ok to take pills or maybe make them look like candy which is even worse?"

3. Twitter: "I still can't believe how stupid the employees that work at that bakery are. How fucking dumb could you be???? *Where ever in life would it be okay to put drugs on a 7 year old kids* [sic] *bday cake and have them think its* [sic] *candy or something?* I'm baffled."

4. Twitter: "All they had to do was say. Hey our bad. Let us refund you for the fuck up and can we make you a new cake? Nah *they were rude, talked crazy shit, blamed my wife and hung up on me. They only became apologetic once they saw I had a following.* Idiots think I did this for attention [emoji]."

5. Twitter: "*And then lied about saying they didn't know it was for a kid.* I was doing damage control for hours. Then I posted the screenshot of the emails and details and my wife specifically telling them it's for my son who has major allergies. Now they quiet smh." ("smh" may be short for "shaking my head.")

6. Twitter: "*The first sign up email states my son is 7.* … My wife walked in 3 times. How old could he be if she's 34? Looks in her late 20's. He ain't gonna be 17+."

7. August 26, 2019 podcast: "*This was a 7 year old kid's party. They put prescription drugs. They put molly. They put Percocets.*"

8. August 26, 2019 podcast: "*This bitch was so fucking rude. Then she hung up on me.*"

9. August 26, 2019 podcast: *"And she tells them and enters in the order through an email. First thing she says is, 'This is for my 7 year old son's birthday. . . .'"*

In response, Yang filed a special motion to strike the complaint under Code of Civil Procedure section 425.16 as a strategic lawsuit against public participation. In his motion and reply, he argued he made each of the statements identified by Big Sugar in furtherance of his First Amendment rights. He claimed the statements related to the public interest because they involve: (1) candy confusion, a topic of public interest; (2) a celebrity's day-to-day life; and (3) a nationally recognized bakery that had poor customer service and had designed a cake posing a risk to children.

Big Sugar opposed the motion, arguing the statements related only to a private dispute about a cake and Yang's desire to "cancel" Big Sugar.

After a hearing on the motion, the trial court denied the motion. The court held none of the statements involved the public interest. The court further concluded that, even if the statements did constitute protected activity, Big Sugar had shown a probability of prevailing on the merits.

Yang appealed.

II

Yang's statements did not involve the "public interest" as this statute defines it.

A

We independently review rulings on special motions to strike. (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788.)

7

Special motions to strike proceed in two steps.  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.)  First, we determine whether the claims arose from protected activity.  (*Ibid.*)  If so, we test whether the plaintiff has shown a probability of success on each claim.  (*Ibid.*)

We reject Yang's motion on the first step.  Yang claims his statements constitute protected activity under subdivision (e)(3) of section 425.16 of the Code of Civil Procedure because he made the statements in a public forum in connection with an issue of *public interest*.

Big Sugar concedes Yang made the statements in a public forum.

Code of Civil Procedure section 425.16, subdivision (e)(3) requires a showing the speaker made the statements in connection with an issue of "public interest."  Evaluating what qualifies as an issue of "public interest" inherently requires consideration of the public/private distinction, a notoriously malleable standard.  (See *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 621 (*Rand*).)

We fully acknowledge the plasticity of the concept of the "public interest."  (Cf. Horwitz, *The History of the Public/Private Distinction* (1982) 130 U. Pa. L.Rev. 1423 [tracing history of distinction from the late medieval period]; see *id*. at p. 1426 ["By 1940, it was a sign of legal sophistication to understand the arbitrariness of the division of law into public and private realms."].)

The Legislature, however, wrote the words "public interest" into this statute.  The goal was not to pose a puzzler but to solve a social problem.  Courts have been working on this definitional issue for years.  Precedent guides our interpretation of this

particular statute's use of the words "public interest."  So too does the paramount rule that determining the statute's purpose is the key to statutory interpretation.  (*Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 934.)

B

In *Rand*, our Supreme Court laid out three categories of statements or conduct that qualify as "public interest":

1. Statements or conduct that concern a person or entity in the public eye;
2. Statements or conduct that could directly affect a large number of persons beyond the direct participants; and
3. Statements or conduct involving a topic of widespread interest.  (*Rand*, *supra*, 6 Cal.5th at p. 621.)

C

Yang makes three arguments on the issue of "public interest."

1

Yang's first argument invokes the third *Rand* category.  He contends his statements involve an issue of public interest because they were about the dangers of "candy confusion," or children mistakenly eating pills they believe are candy.  Yang cites a study from the American Academy of Pediatrics and a warning from the Centers for Disease Control and Prevention about the dangers of children confusing medication for candy.

This form of argument is common in special motions to strike:  Yang claims that, because his statements bear some connection to an issue of public significance, his statements deserve protection.

9

Agile thinkers always can create some kind of link between a statement and an issue of public concern. All you need is a fondness for abstraction and a knowledge of popular culture. (See *Dual Diagnosis Treatment Center, Inc. v. Buschel* (2016) 6 Cal.App.5th 1098, 1106 ["Almost any statement, no matter how specific, can be construed to relate to some broader topic."].)

This pervasive potential means there must be "some degree of *closeness* between the challenged statements and the asserted public interest." (*Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132, italics added (*Weinberg*).) A tangential relationship is not enough. (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 140 [defendant's statements were "too tenuously tethered to the issues of public interest they implicate, and too remotely connected to the public conversation about those issues, to merit protection"].) There is "a need to go beyond the parochial particulars of the given parties." (*Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34.)

The trial court correctly identified this error of abstraction and rightly ruled that, while "candy confusion" might be an issue of public interest, Yang's statements did not discuss the danger of children confusing medications for candy. That was not Yang's point. Yang's statements did not seek public discussion of anything. They aimed to whip up a crowd for vengeful retribution. They were an unprotected effort " 'to gather ammunition' " in his spat with Big Sugar. (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1132–1133.)

Yang argues the trial court erred in finding he stated the cake bore actual prescription pills instead of replicas. This point is immaterial; Yang's statements were not about a topic of public interest.

Yang's second argument invokes the first of the *Rand* categories. Yang asserts both he and Big Sugar are in the public eye: Yang, because he is a celebrity with 1.5 million social media followers, and Big Sugar, because it has achieved "national notoriety."

We do not explore whether Yang is a celebrity because the argument is fundamentally unsound. Yang incorrectly suggests his celebrity status means everything he says is of public interest. This is not so. (*Bernstein v. LaBeouf* (2019) 43 Cal.App.5th 15, 23–26 [celebrity status alone insufficient to render anything the person says subject to protection] (*Bernstein*).) Even people of great renown are capable of banalities, as are we all.

Nor can Yang rely on the fact he published his statements to many people. (*Bernstein*, *supra*, 43 Cal.App.5th at p. 24 [a private dispute cannot be made into a matter of public interest through wide communication to the public].) Shouting makes the volume loud. It does not make the content worthy. (See, e.g., *Abuemeira v. Stephens* (2016) 246 Cal.App.4th 1291, 1295, 1298.)

Yang cites a case on which the Supreme Court has granted review: *Serova v. Sony Music Entertainment* (2020) 44 Cal.App.5th 103, review granted April 22, 2020, S260736. In *Serova*, fans of the late singer Michael Jackson brought a class action to attack a record company's statements that Jackson was the singer on posthumous songs the company released. The fans alleged a soundalike singer was the actual performer of certain songs, and the record company's contrary claims were actionable. (*Id*. at pp. 111–113.) However our Supreme Court ultimately decides *Serova*, the issue there apparently involves questions of

art versus commerce. (*See id.* at pp. 130–131 ["No one could reasonably dispute that knowing whether a piece of music was composed by Johann Sebastian Bach or a picture was painted by Leonardo Da Vinci informs the historical understanding of the work. . . . Thus, the marketing statements at issue here are unlike the purely factual product or service descriptions constituting commercial speech in cases that Serova cites."].) We have nothing similar here.

Mere mentions in national publications do not make Big Sugar a business in the public eye. Despite its name, Big Sugar is a small business. It has two shops in Los Angeles. That is all.

Yang's and Big Sugar's supposed proximities to fame do not turn this into a case of public interest.

3

Yang's final argument focuses on a subset of the third *Rand* category and incorporates elements of the second *Rand* category. Yang contends his statements involve the public interest because they provide consumer protection information.

Courts have recognized the growth of consumerism in the United States and have acknowledged the importance of public access to consumer information. (*Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 898–899 (*Wilbanks*).) Decisions generally have extended protection, however, only when the "consumer information" goes beyond recounting a one-time dispute between a buyer and a seller. (See *id.* at p. 900.) Yang's quest for revenge did not give consumers information beyond his complaints about his one cake order. Consumers are interested in the reactions of other consumers, but a single report is the classic small sample, subject to the classic small sample error. Yang's complaints

12

about the decoration of a cake are not a public interest discussion.  We explain.

a

The consumer protection cases Yang cites do not support his case.

In *Wilbanks*, the defendant, Gloria Wolk, published a website about viatical insurance that provided consumer advice and warnings, including a warning about a particular brokerage.  Wolk was a "consumer watchdog," not a consumer: Wolk had never purchased anything from the plaintiff.  Wolk had studied and written books about the industry, and her website provided consumer information about it, including about the potential for consumer fraud.  Wolk identified brokers she believed engaged in unethical or questionable practices.  The court held her statements constituted protected speech. (*Wilbanks*, *supra*, 121 Cal.App.4th at pp. 889–890, 898–899, 901.)

*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13 (*Gilbert*) involved largely analogous facts:  a website gave consumers information about plastic surgery.  The site offered advice, information, and a contact page where readers could share experiences.  There were tips on choosing a plastic surgeon, references to other resources, a list of warning signs to keep in mind, and ruminations about plastic surgery in general.  True, the site recounted the author's bad experience with a particular plastic surgeon, but that complaint was but an aspect of a larger consumer-oriented presentation.  (*Id*. at pp. 19–24.)

*Carver v. Bonds* (2005) 135 Cal.App.4th 328 (*Carver*) concerned an in-depth news exposé, not a lone consumer gripe.  A lengthy article in the San Francisco Chronicle revealed a

13

physician was using phony celebrity associations to promote himself. The main defendants were two reporters who wrote the article. They quoted two athletes the plaintiff—one Dr. Andrew Carver—publicly but falsely claimed were former and satisfied patients. One was Barry Bonds. "Asked by The Chronicle about Carver, Bonds said only, 'I don't like that man. I don't like that man. He's a liar.' " (*Id*. at p. 341.) The other athlete said he did not know Carver. Carver sued these reporters and athletes, who responded with a special motion to strike. The court found the news article concerned a topic of public interest and granted the motion. The court reasoned the article warned readers not to rely on doctors' ostensible experience treating professional athletes and told what it described as a cautionary tale of Carver exaggerating that experience to market his practice. (*Id*. at pp. 332–333, 335, 343–344.)

In *Wong v. Jing* (2010) 189 Cal.App.4th 1354 (*Wong*), a father posted a review on Yelp complaining about a pediatric dentist's use of both nitrous oxide and silver amalgam for fillings. The review noted silver amalgam contains mercury. The court found the review qualified for protection because it went beyond a critical opinion of one dentist. It was part of a public discussion on issues of public interest: the uses of nitrous oxide and silver amalgam in the treatment of children. (*Id*. at pp. 1361, 1367.)

The statements in *Wilbanks*, *Gilbert, Carver*, and *Wong* all included some discussions of topics in the public interest. Yang's postings were not a discussion of anything. They were only a diatribe. But "an attempt to exact a personal revenge" by causing others to ostracize the target is not a protected public interest statement. (*Wilbanks, supra*, 121 Cal.App.4th at p. 900, fn. 6.)

14

Yang also cites *Chaker v. Mateo* (2012) 209 Cal.App.4th 1138 (*Chaker*).  Darren Chaker and Nicole Mateo had a child together and then became locked in contentious paternity and child support litigation.  Wendy Mateo was Nicole Mateo's mother and the child's grandmother.  She posted derogatory comments about Chaker on a website called "Ripoff Report" and a social media platform.  She claimed Chaker was a deadbeat dad, a criminal, might be on steroids or into illegal activities, and warned potential customers against using Chaker's forensic business.  The *Chaker* court wrote some of the postings "were intended to serve as a warning to consumers about [Chaker's] trustworthiness." (*Id*. at pp. 1141–1142, 1146.)

"Of particular significance is the fact that it appears from the record Chaker became the subject of statements on the 'topix' Web site only after he posted a profile on the Web site and it generated responses from other members of the community, including apparently statements from Wendy.  Having elected to join the topix Web site, Chaker clearly must have recognized that other participants in the Web site would have a legitimate interest in knowing about his character before engaging him on the Web site." (*Chaker, supra*, 209 Cal.App.4th at pp. 1146–1147.)

*Chaker* does not follow the pattern of the cases we have just mentioned.  The comments did not relate to a single transaction, or indeed to any transactions.  Rather they seemed to express Wendy Mateo's animosity and desire to sully Chaker's reputation.  We are uncertain her personal animosity was of public interest.  To the extent *Chaker* can be read to protect any review of a person or business, we respectfully disagree.

15

### b

These cases illustrate why Yang's statements do not qualify for protection under the consumer protection umbrella.

Yang's statements relate only to one transaction with Big Sugar. He published them on his social media accounts to air his dissatisfaction with a particular cake. His statements were not part of a larger discussion. Courts must scrutinize the purpose of the statements, and where that purpose is simply to gather " 'ammunition for another round,' " it is not in the public interest. (*Weinberg*, *supra*, 110 Cal.App.4th at pp. 1132–1133.)

To avoid the fact that Big Sugar is a small business that does not affect a large number of people, Yang relies on the idea in *Wilbanks* and *Wong* that courts look at whether the industry implicated by the business practice affects a large number of people. Yang, however, has not identified a business practice implicating the public interest.

Yang is complaining about a cake order. He did not like the cake and he did not like the service. Those are not issues of public interest.

## DISPOSITION

We affirm the judgment and award costs to the respondent.


WILEY, J.

We concur:


STRATTON, Acting P. J.


OHTA, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# APPENDIX A



