Filed 10/6/22  Berookhim Royal Catering v. Farnad CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BEROOKHIM ROYAL CATERING, INC. et al., <br><br> Plaintiffs, Cross-defendants and Respondents, <br><br> v. <br><br> SHAHBAZ FARNAD et al., <br><br> Defendants, Cross-complainants and Appellants. | B311529 <br><br> (Los Angeles County Super. Ct. No. 20STCV15941) |

APPEAL from an order of the Superior Court of Los Angeles County, Stuart M. Rice, Judge.  Affirmed.

Blank Rome and Arash Beral for Defendants, Cross-complainants and Appellants; Devaney Pate Morris & Cameron, Susan L. Mason and David R. Plancarte for Defendant, Cross-complainant and Appellant Shahbaz Farnad.

Law Offices of Payam Poursalimi, Payam Y. Poursalimi; Azadegan Law Group and Ramin Azadegan for Plaintiffs, Cross-defendants and Respondents.

_____

This appeal arises from the trial court's denial of a Code of Civil Procedure section 425.16[1] special motion to strike the complaint of Berookhim Royal Catering, Inc., doing business as Beverly Catering, and its principal, Mehran Berookhim (Berookhim) (collectively, Plaintiffs) against Shahbaz Farnad M.D. (Farnad) and his sister Parvaz Farnad Mizrahi, D.D.S. (Mizrahi) (collectively, Defendants).

Farnad had hired Plaintiffs to provide kosher catering services for his wedding scheduled during Memorial Day weekend in May 2020. Berookhim requested a deposit of at least $5,000 to hold the date for Farnad's wedding. Farnad wrote a check for $12,000 to Berookhim.

Due to the Covid-19 pandemic, in March 2020, Farnad cancelled Plaintiffs' services and demanded a full refund. Berookhim explained he could refund $7,000, but that the $5,000 deposit was non-refundable. Less than an hour after their final communication on the issue, Farnad posted on Facebook that Plaintiffs were, inter alia, thieves and crooks, and that

_____

[1] SLAPP is an acronym for "strategic lawsuit against public participation." (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 57.) For clarity, we refer to a "SLAPP" or "anti-SLAPP" motion as "a special motion to strike"—the language used in the statute (Code Civ. Proc., § 425.16, subd. (b)(1)). All unspecified statutory references are to the Code of Civil Procedure.

Berookhim was a swindling lying scam artist. Farnad "made the post public so people [could] see what a thief [Berookhim] is and all the stealing that his company Beverly Catering does." Farnad asked others, over four dozen times, to post reviews or repost his original post to assist him in "expos[ing]" "their thievery." Farnad's sister, Mizrahi, shared Farnad's post and disseminated it on other social media sites.

Plaintiffs sued Defendants for, inter alia, defamation and intentional infliction of emotional distress. Defendants moved to strike the complaint pursuant to section 425.16, contending the causes of action arose from statements made in a place open to the public or a public forum in connection with an issue of public interest or in furtherance of the exercise of the constitutional right of free speech in connection with a public issue or an issue of public interest. (§ 425.16, subd. (e)(3), (e)(4).)

The trial court agreed with Defendants that their speech was protected activity within the meaning of the statute, but also found that Plaintiffs demonstrated a probability of prevailing on their causes of action. (§ 425.16, subd. (b)(1).) Accordingly, it denied the special motion to strike.

On appeal, Defendants raise several arguments challenging the trial court's finding of a probability of Plaintiffs prevailing on their claims. They also request that we award fees and costs to them as prevailing parties on their special motion to strike and on appeal. For their part, Plaintiffs argue the trial court erroneously found that Defendants' posts were made in connection with a public issue or an issue of public interest.

We conclude Defendants have not demonstrated their speech was made in connection with a public issue or an issue of public interest. In the Spring of 2020, the Covid-19 pandemic

was an issue of public interest.  However, a $5,000 (or even $12,000) financial dispute between a prospective groom and his erstwhile caterer over a deposit for a cancelled wedding does not qualify as an issue of public interest just because it was occasioned by the pandemic.  The communications at the heart of this case are personal, financial, and by their terms, untethered to any pre-existing issue of interest to anyone but the online combatants.  They are also acknowledged to have been triggered by an emotional outburst that occurred within an hour of the final unsatisfying communication between the parties about the requested refund.  Unfortunately, the outburst occurred in a social media post which, over the course of the one day before Farnad removed it, generated approximately 100 comments.  Yet those comments—and certainly Farnad's responses to those comments—had little connection to any broader public issue; rather, they focused on expressing empathy for Farnad, suggesting solutions, taking sides in the particular refund dispute that triggered the posting, or expressly not taking sides but urging that the dispute should be handled privately.

Applying the analytical framework our Supreme Court has mandated for the resolution of such issues (see *FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133 (*FilmOn*); *Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610 (*Rand*)), we have examined the communications at issue in their context to determine, as a threshold matter, whether the first prong necessary for a meritorious special motion to strike pursuant to section 425.16 has been met.  We conclude Defendants' motion fails because the speech at issue was not in connection with an issue of public interest.  Thus, we affirm the trial court's denial of the special motion to strike, albeit on different grounds than the

4

trial court's ruling,[2] and deny Defendants' request for fees and costs.

## BACKGROUND

### A. Factual Summary

On February 12, 2020, Farnad contacted Berookhim to inquire about Plaintiffs' kosher catering services for his wedding, scheduled for Memorial Day weekend, 2020. On February 14, 2020, Berookhim sent Farnad a text message informing Farnad, "There's another client who just called me today [f]or the same date,[ ] but I'm holding it for you. All you need to do is give $5000 deposit on credit card[ ] to save the date, [w]henever you['re] ready." Farnad responded, "do not take another client please. I[']m counting on you. . . ."

On February 27, 2020, Farnad, Mizrahi, and Mizrahi's husband met with Berookhim. Berookhim informed Farnad that the total catering charge would be approximately $24,000. The next day, Farnad returned to Berookhim's office and asked him how much he should write the check for. Berookhim responded that he would be happy with anything over $5,000. Farnad wrote Berookhim a check for $12,000, and Berookhim stated he would provide a formal agreement and updated menu.

According to Berookhim, before Farnad gave him the deposit, Berookhim "told [Farnad] at least four separate times that his deposit was non-refundable. More specifically, [Farnad]

---

[2] If a trial court's ruling or decision is correct on any theory, the appellate court will affirm it regardless of the trial court's reasoning. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)

5

kept asking [Berookhim] if he would get a refund if he broke up with his fiancée and [Berookhim] would always tell him he could not get a refund if he cancelled."

By March 12, 2020, Farnad had not received the updated menu or the written contract, although he requested the documents at least twice. Alluding to the Covid-19 pandemic and executive order requiring social distancing, Farnad sent a text message to Berookhim stating, "there [is] a small chance that we will have to push back the wedding. . . . Just need to know what the options are at this point please." Berookhim responded, "In case you decide to postpone, I will credit your entire deposit to the appropriate date. That way you don't lose any money. . . . It's happening to everybody. . . . Don't worry. We are going to put together a beautiful wedding for you in case you postpone." Farnad stated, "there[']s a possibility that we will . . . forego a wedding party entirely. . . . [I]n the case that we do that, [I']d ask to get the deposit refunded in full please." Berookhim told him, "[I]n that scenario, unfortunately we cannot give a full refund. We would have to keep at least $5000[,] [b]ecause unfortunately we gave up our wedding spot for you. I will be able to refund $7000 . . . . In case you decide to have the wedding at a future date, I will cr[e]di[t] that deposit so you don't lose any money." Farnad did not respond to this text.

On March 22, 2020, Farnad informed Berookhim by text message that that he and his fiancée were cancelling the wedding, and "would like to get the full $12[,000] refunded . . . . I don't see any reason to keep a deposit of $5[,000] for that date at this point because no other event would be possible for that date right now." Berookhim explained, "[W]e turned away three weddings on your dates. And even if the weddings do not happen

6

on that specific date, these are all clients that we are postponing their events to other dates. Meaning if not for your wedding, we would've booked another wedding and postponed them to another date." In response, Farnad sent his mailing address.

On April 6, 2020, Farnad noted he had not yet received the check and wanted to know when he could expect it. Berookhim responded that he would be sending it out soon. Farnad then stated, "I hope you refund the full amount since there was never a mention of [a] non-refundable deposit and you never sent a contract to me despite several requests."

According to Farnad, by April 14, 2020, he had not received any refund. He telephoned Berookhim, who told him he was "just about to send . . . the check." Farnad sought to confirm Berookhim would be refunding the entire $12,000. After an exchange in which the parties continued to disagree as to how much Plaintiffs should refund to Farnad, Berookhim stated, "You know what? F[***][3] you!" and hung up.

At 4:35 p.m. on April 14, 2020, Farnad texted Berookhim, "Ron [Berookhim's nickname] don[']t do this." "You are being so short sighted Ron." "Okay this is what you want, then this is what we'll do. You f[***]ed with the wrong person." Thereafter, that same day, Berookhim texted Farnad, "After our conversation today, and your threats, I spoke to my lawyer. Under the advice of my attorney, I'm not to communicate further with you. He has

---

[3] We generally omit profanity from our opinions if it is gratuitous, but here both parties resorted to it as their dispute became more emotional and that lack of emotional control was offered as a material fact by Farnad in his arguments below and on appeal.

7

advised not to give any money back to you. Any communications you have must be made to [Berookhim's attorney]."

At 5:16 p.m. that day, Farnad tagged Beverly Catering's Facebook page and posted on Facebook the following message: "Ron Berookhim of Beverly Catering is a thief and a disgusting person. Here's the story: at the end of February [I] spoke to Ron about catering my wedding on Memorial Day weekend. Without a contract or any discussion of non-refundable deposit, and as a measure of goodwill, [I] went to his office and gave him a check for $12[,000]. Over the course of the next two weeks, [I] repeatedly sent him messages to please send me a contract. He never did. Amidst the coronavirus pandemic, my wedding was cancelled. I have since tried to get Ron to return my money and he has been nothing more than a swindling, cheating, disgusting animal. He refuses to return my money despite the fact that city, county, state and federal agencies have forced me to cancel what was supposed to be the happiest day of my life. I[']m a young guy trying to start a beautiful life with my bride in the midst of a global pandemic. This lame excuse for a human being is not only stealing our money, he has cussed me out and made threats to me over the phone. I don[']t know why he thinks he deserves to hold on to $12[,000] of my money for an event that he did no work for or provided any services to, but people need to see him for who he is. A thief. Do not use him to cater your events. Do not invite this evil disgusting thief into your joys. He is a shame to his community and a swindling lying scam artist who does not have the empathy to think of a young couple trying to get their lives started on a positive note. Please share this story so everyone sees this thief for who he is. His despicable actions are a disgrace to the Jewish community during a difficult time across the globe

where people should be coming together.  Please share this story on Yelp, Google, [s]ocial media and all other venues that you can think of so people see the truth.  I beg you all to please not embelish [*sic*] the story from the facts above.  I only ask the truth to be shared.  Thank you in advance!  @beverlycatering Mehran Ron Berookhim [hyperlinked to Berookhim's Facebook page] #thief."[4]

The parties point out that Farnad's post received 550 comments.  However, over 100 of those comments were Farnad's responses to comments, reiterating that Berookhim was a crook and thief, who stole his money, that Farnad would "expose [Berookhim's] fraud for all to see," and urging others to repost his post or write their own reviews to "expose[ ]" Plaintiffs "for their thievery" and that "Beverly Catering needs to pay."  Over 50 of the comments appear to be the same comment by Berookhim, sharing his side of the story, including that "somebody tried to blackma[il] [him]."  One hundred people commented on the

---

[4] "A hashtag is a brief statement that categorizes or summarizes the post and uses a hash symbol (#) before a relevant keyword or phrase to make that word or phrase more readily searchable.  On most social-media platforms, hashtags are interactive, so that clicking on a hashtagged word within a tweet or post will show the reader other tweets or posts marked with that keyword.  Hashtags that are used with the most frequency become 'trending topics' that are highlighted for other social-media users."  (Lidsky & Jones, *Of Reasonable Readers and Unreasonable Speakers: Libel Law in a Networked World* (2016) 23 Va. J. Soc. Pol'y & Law 155, 165, fns. omitted (hereafter *Of Reasonable Readers*).)

thread created by Farnad's original post.[5]  In response to one comment that Farnad could file a theft report with the Los Angeles Police Department (LAPD), Farnad responded that he was "going to file a police report."[6]

At 11:05 p.m. on April 14, 2020, Berookhim also independently posted his side of the story on his Facebook page.

[5] Some commenters urged Farnad to take Berookhim to small claims court or report him to the Better Business Bureau. Others urged Berookhim to give Farnad back his deposit; another asked for (and was given) Berookhim's phone number so they could "pester" him; another pointed out that Farnad should remind Berookhim that Farnad has "2,680 friends"; and another posted an emoji of an arm with a flexing bicep, assuring Farnad "we are here brother!!  You don't always need a lawyer."  Others shared they had used Berookhim's services and were unsatisfied; some also defended Berookhim; and others urged Farnad to not make their dispute public.

[6] We observe that the Facebook comments about reporting the matter to the LAPD are included as an exhibit to Berookhim's declaration in opposition to the special motion to strike and that these posts do not appear in the over 120 pages of Facebook comments that Defendants submitted in support of their motion to strike.  In the paragraph of Berookhim's declaration that referred to this exhibit, Berookhim concluded that readers understood Farnad was accusing Berookhim of criminal theft. Defendants objected to that paragraph on the basis that Berookhim's statements were legal conclusions or ultimate facts. Defendants further objected that the testimony lacks foundation and that the commenter's statements constituted inadmissible hearsay.  The trial court sustained the objection.  Although Berookhim's statements were properly excluded, the posts he authenticated were properly admissible along with the other social media postings in the record.

Another of Farnad's sisters commented on Berookhim's Facebook post: "My brother posted something in anger . . . . Even if I weren't his sister, it's plain & simple. You took his money to cater an event that is no longer happening. Just return his money. It doesn't take a rocket scientist to figure it out. . . . He obviously had no doubts or your abilities or reputation as a caterer—he was hiring you for the biggest event in his life."

For her part, Mizrahi contends "[t]he limit of [her] online involvement in this matter concerns [her] sharing [her] brother's April 14 Facebook post (which [she] later deleted), a Yelp review that [she] left regarding Plaintiffs (which Yelp removed) and a Google review that [she] had inadvertently left from [her] daughter's account (which [she] removed immediately after [she] discovered that [her] daughter's name was associated with the review). Additionally, [she is] a member of the LA Mommies Facebook group, which was created by a Persian Jewish mother. . . . Many members posted about the dispute on the LA Mommies group." Mizrahi responded to one of those comments, setting forth, among other things, the merits of her brother's dispute with Berookhim.

By April 16, 2020, Farnad had deleted his post and created a new post on Facebook. The preamble of his post stated, "Two nights ago, I posted a statement with choice words and characterizations about a member of my community and about my experience with his catering company. The post spread quickly and got a considerable amount of attention. I wrote it because I felt utterly violated by the vendor and wanted the community to hear my story. I've come to realize that my emotional plea to have my voice heard was not my most elegant moment—a mistake to call him out without sharing the entirety

11

of the story, without proof, and not giving him an honest open platform to give his version of the events." He described the details of his interaction with Berookhim. He then concluded, "After this . . . I decided to take this to the court of public opinion and share it with my community. . . . I stand by my words and my character for all to see and reflect on. I made the decision to take this to the community and not simply seek legal recourse because the task of taking a vendor to court during these hard times is just exhausting to think about right now. I was left no choice. I will leave this here for the readers to judge this for themselves. . . . I shared this experience with my community so that other brides and grooms don't deal with the same misfortune. So other brides and grooms don't feel voiceless during this time. So other brides and grooms don't start their life with wasted debt and difficult memories. I shared this experience so that our community doesn't accept theft under the banner of kashrut."

On April 21, 2020, Farnad's attorney sent a letter to Berookhim. Among other things, Farnad's attorney urged Berookhim to take down his Facebook post, and stated, "Enraged by your conduct and inappropriate personal attack upon him [Farnad] resorted to a public posting for retribution. After a day [Farnad] recognized that his emotional reaction was regrettable and removed the posting. [¶] . . . [¶] [Farnad] was wrong to air his grievances publicly, and openly regrets having done so despite his disappointment by your retention of his funds. . . ." Berookhim's counsel responded to Farnad's counsel by email. Among other things, he stated, "rest assured the money is in escrow until litigation is complete."

Berookhim claimed that as a result of Farnad's conduct, he experienced anxiety, stress, heart palpitations, headache, and have had difficulty falling asleep. Further, he submitted a declaration of a potential customer who stated that he did not use Plaintiffs' catering business because of Farnad's statements on Facebook to support his claim that he lost business.

## B. Procedural History

On April 27, 2020, Plaintiffs filed a verified complaint against Farnad, Mizrahi, and Does 1 to 100, alleging causes of action for defamation per se, defamation, trade libel, slander, false light, and intentional infliction of emotional distress. In particular, the complaint focused on Defendants' statements that Plaintiffs are " 'thieves' "; Berookhim " 'of Beverly Catering is a thief' "; Berookhim " 'is [a] thief' "; Plaintiffs are " 'crooks' "; and " 'Do not use him to cater your events. Do not invite this evil disgusting thief into your joys. He is a shame to his community and a swindling lying scam artist . . . . Please share this story so everyone sees this thief for who he is. His despicable actions are a disgrace to the Jewish community. . . . He is a swindling lying scam artist. . . . Please share this story so everyone sees this thief for who is. . . . Please share this story on Yelp, Google, Social medica [*sic*] and all other venues that you can think of so people see the truth.' "**7** (Italics omitted.) Plaintiffs sought

---

**7** Plaintiffs' complaint identifies other statements, most of which are in the same vein, made on social media between Doe Defendants and Farnad. Neither the complaint nor Defendants' motion to strike identifies which statements are attributable to Farnad or Mizrahi and which are attributable to the Doe Defendants.

injunctive relief and prayed for damages, punitive damages, and attorney fees and costs.

On June 16, 2020, Defendants filed a verified answer to the complaint, a cross-complaint,[8] and a special motion to strike the entirety of the complaint, or in the alternative portions thereof.

In their special motion to strike, Defendants argued Plaintiffs' causes of action arose from activity protected under the anti-SLAPP statute as their statements were "written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest," and "other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3)-(4).)

Defendants' counsel submitted a declaration in support of the motion to strike. In it, he identified as an "Iranian Jew," and "inform[ed] the [c]ourt that, without a doubt, Plaintiffs have built a notable reputation among the Persian Jewish community in Southern California." Counsel's personal experience has been that "there are only a handful of reputable glatt kosher caterers specializing in Persian food in Southern California that could service a large (200+) wedding reception." Further, he observed that April 14, 2020 was a memorable night for the Persian Jewish community "due to the online spat" between Farnad and

---

[8] In his cross-complaint, Farnad alleged causes of action for violation of Penal Code section 496; conversion; fraud; breach of contract; money had and received; open book account; account stated; breach of the implied covenant of good faith and fair dealing; violations of Business and Professions Code section 17200 et seq.; and restitution to avoid unjust enrichment.

Berookhim.  No one within the community conveyed to counsel that they believed Berookhim was defamed.  Rather, "[t]he value that they've ascribed to the posts are not Defendants' words at all (which have been chalked up to a legal dispute over a defined amount of money) but those of third parties who . . . disclosed their *own* experiences with Plaintiffs."

On February 10, 2021, the trial court ruled that Defendants had demonstrated the first prong under the anti-SLAPP statute because their statements were "made in a place open to the public or a public forum in connection with an issue of public interest."  (§ 425.16, subd. (e)(3).)  As to the issue being one of public interest, the court found, "[t]he evidence before the court reflects that the professionalism and quality of service rendered by a caterer is an issue of public interest not only in the Persian Jewish community, where Defendants contend that it is of highest importance, but also to the public at large because the statements may serve as a warning not to use the Plaintiffs' services."  "Farnad's dealings with Plaintiffs pertaining to the refunds of a deposit, whether a meritorious claim or not, shed light on the experience of contracting with Plaintiffs' business, and therefore may assist other potential clients in choosing a caterer for their own events."

However, the trial court also found that Plaintiffs defeated Defendants' special motion to strike by demonstrating a probability of prevailing on their claims.[9]  Thus, the trial court denied the special motion to strike.

_____

[9] As to defamation, the trial court found that "Defendants accuse Plaintiffs of the crime of larceny" and whether Defendants' statements are false hinged on whether the $5,000 was

15

Defendants timely filed this appeal.

## DISCUSSION

## A. Statutory Framework and Standard of Review

The Legislature enacted section 425.16 to "combat lawsuits designed to chill the exercise of free speech and petition rights." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1060.) To that end, the anti-SLAPP statute provides that "[a] cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Acts in furtherance of the right of free speech that are relevant here include "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest" and "any . . . conduct in the furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(3), (4).)

When considering whether a claim should be stricken, courts undertake a two-prong analysis. "First, the defendant

refundable or not. For purposes of the motion, however, it found Plaintiffs carried their burden. As to the intentional infliction of emotional distress claim, the trial court found Defendants' argument that such a claim could only arise out of bodily injury or that there was a requirement of a duty was incorrect.

must establish that the challenged claim arises from activity protected by section 425.16.  [Citation.]  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success."  (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384; accord, *Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009.)  "The plaintiff can carry his burden by making a prima facie showing of facts that would, if proved, support a judgment in his favor.  [Citation.]  The court's consideration of the defendant's evidence is limited to determining whether it defeats the plaintiff's showing as a matter of law.  [Citation.]  The trial court does not weigh the evidence or make credibility determinations.  [Citation.]"  (*Midland Pacific Building Corp. v. King* (2007) 157 Cal.App.4th 264, 271.)

We review de novo the trial court's grant or denial of a special motion to strike under the anti-SLAPP statute.  (*Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1067.)  "[O]nly a claim ' "that satisfies *both* prongs of the anti-SLAPP statute . . . is a SLAPP, subject to being stricken under the statute." ' [Citation.]"  (*Serova v. Sony Music Entertainment* (2022) 13 Cal.5th 859, 872.)  Thus, we may evaluate either prong that resolves the appeal.  (See *ibid*., citing *Citizens for Fair REU Rates v. City of Redding* (2018) 6 Cal.5th 1, 7 [when one argument resolved a case, we did not need to discuss an alternative argument that would have led to the same result].)

17

**B. Defendants' Statements Are Not Protected Activity Because They Do Not Implicate an Issue of Public Interest**

1.  *Legal Principles*

Section 425.16 does not define "an issue of public interest." (See generally § 425.16.) However, our Supreme Court has counseled that courts should conduct a two-part analysis that considers the content and context of the speech when assessing whether an issue is one of public interest. (*FilmOn*, *supra*, 7 Cal.5th at p. 149.) "First, we ask what 'public issue or . . . issue of public interest' the speech in question implicates—a question we answer by looking to the content of the speech. [Citation.] Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest. It is at the latter stage that context proves useful." (*Id.* at pp. 149-150; see *Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1243 [describing *FilmOn*'s two-part test as: "first, we ask what public issue or issues the challenged activity implicates, and second, we ask whether the challenged activity contributes to public discussion of any such issue"].)

"[C]ontextual considerations [are not] relevant merely to some generalized evaluation implicit in the analysis. In articulating what constitutes a matter of public interest, courts look to certain specific considerations." (*FilmOn*, *supra*, 7 Cal.5th at p. 145.) Such considerations include whether "the statement or conduct concerns 'a person or entity in the public eye' " (*Rand*, *supra*, 6 Cal.5th at p. 621); " 'could affect large numbers of people beyond the direct participants' " (*FilmOn*, *supra*, at p. 145); "involves 'a topic of widespread, public interest' " (*Rand*, *supra*, at p. 621) and " 'itself contribute to the public debate' " (*FilmOn*,

18

*supra*, at p. 150); "or 'affect[ed] a community in a manner similar to that of a governmental entity' " (*id*. at pp. 145-146). Further, " ' "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest." ' " (*Rand*, *supra*, at p. 621.) Additionally, " ' "[a] person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people." ' " (*Ibid*.)[10]

Of particular relevance to resolving the instant appeal is our Supreme Court's admonition to resist arguments based on beguiling abstractions that can often give a false impression that a party-specific dispute implicates broader issues of public concern: "At a sufficiently high level of generalization, any conduct can appear rationally related to a broader issue of public importance. What a court scrutinizing the nature of speech in the anti-SLAPP context must focus on is the speech at hand, rather than the prospects that such speech may conceivably have indirect consequences for an issue of public concern. ([See, e].g.,

---

[10] Defendants cite *Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027 for the proposition that an issue of public interest "is any issue in which the public is interested." (*Id*. at p. 1042, italics omitted.) As our colleagues in Division Seven have observed, "*Nygard's* sweeping pronouncement, made 11 years before *FilmOn*, is at odds with the Supreme Court's caution that determining whether the subject of speech or other conduct constitutes a matter of public interest requires an evaluation of specific contextual considerations, such as whether a person or entity was in the public eye or whether the activity occurred in the context of an ongoing controversy, dispute or discussion." (*Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802, 822, fn. 8.)

*. . . Consumer Justice Center v. Trimedica International, Inc.* (2003) 107 Cal.App.4th 595, 601 . . . ['If we were to accept [defendant's] argument that we should examine the nature of the speech in terms of generalities instead of specifics, then nearly any claim could be sufficiently abstracted to fall within the anti-SLAPP statute']; *Commonwealth Energy Corp. v. Investor Data Exchange, Inc.* (2003) 110 Cal.App.4th 26, 34 . . . ['While investment scams *generally* might affect large numbers of people, the specific speech here was a telemarketing pitch for a particular service marketed to a very few number of people. . . . The speech was about [defendant's] *services*, not about investment scams in general'].)" (*Rand*, *supra*, 6 Cal.5th at p. 625.)

On appeal, Defendants argue that the relevant specific considerations described above weigh in favor of finding—as the trial court did—that the Defendants' social media posts concerned an issue of public interest. They contend Plaintiffs are in the public eye; that Farnad's Facebook post could and did affect large numbers of people beyond Plaintiffs and Defendants in that it provided members of the Persian Jewish community with "useful information regarding Plaintiffs" during the Covid-19 pandemic; and involved a topic of widespread interest—namely, "the quality of services provided to the Jewish and Persian Jewish communities by kosher caterers specializing in large events, particular[ly] during the Covid-19 [p]andemic."

In response, Plaintiffs place significant reliance on the recent appellate opinion of *Woodhill Ventures, LLC v. Yang*

20

(2021) 68 Cal.App.5th 624 (*Woodhill Ventures*).[11]  In *Woodhill Ventures*, the wife of a "[s]elf-proclaimed celebrity jeweler" with 1.5 million social media followers, Ben Yang, ordered a cake from Big Sugar Bakeshop (Big Sugar) for their seven-year-old son.  (*Id.* at pp. 626, 627.)  Big Sugar, which had two shops in Los Angeles and had been mentioned in national publications (*id.* at p. 634), created a cake, pursuant to Yang's wife's instructions, that appeared to have a knocked-over beaker atop a cake from which pill-like objects spilled (*id.* at p. 638).  When the Yangs received the cake, they believed the fondant pills looked too realistic and demanded an apology and a refund.  (*Id.* at pp. 626-627, 628.)  Yang then turned to Twitter and Instagram, where he accused Big Sugar of putting "prescription pills" on a seven-year-old's birthday cake and stated, inter alia, " 'we gonna make @bigsugarbakeshop feel it,' " " '[a]nyone . . . would know that you should never ever put drugs on a [seven] year old kids [*sic*] b[irth]day cake,' " and that he would " 'make sure nobody [he knew] . . . ever does business with idiots such as your business.' " (*Id.* at p. 628, capitalization omitted.)

In considering whether Yang's speech concerned an issue of public interest, Division Eight of this court observed that "[m]ere mentions in national publications do not make Big Sugar a business in the public eye."  To the contrary, it was a small business.  (*Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 634.)  Yang also failed to persuade the appellate court that his statements were of public interest because they were about the

---

[11] *Woodhill Ventures*, *supra*, 68 Cal.App.5th 624 was decided after the trial court issued its ruling in the instant matter.

21

dangers of children mistakenly eating pills they believed were candy. (*Id*. at p. 632.) The court concluded that although candy confusion was a topic of public interest, Yang's statements lacked a sufficient degree of closeness to that topic. (*Ibid*.) Reflecting upon the context of the statements, the court concluded, "Yang's statements did not seek public discussion of anything. They aimed to whip up a crowd for vengeful retribution." (*Id*. at pp. 632-633.) Finally, the appellate court rejected Yang's argument that his posts served as consumer protection information. It observed, "[d]ecisions generally have extended protection . . . only when the 'consumer information' goes beyond recounting a one-time dispute between a buyer and a seller." "Yang's quest for revenge did not give consumers information beyond his complaints about his one cake order." (*Id*. at p. 634.)

The reasoning in *Woodhill Ventures* is sound and in keeping with the Supreme Court's guidance in *FilmOn* that courts consider the context as well as the content of the statements at issue. Moreover, given the factual parallels, including the similar tone of much of the speech in this matter and in *Woodhill Ventures*, we conclude that Plaintiffs are correct that *Woodhill Ventures* is particularly instructive on this appeal.

2.  *Plaintiffs Are Not in the Public Eye*

Here, Defendants argue that Plaintiffs are in the "public eye." They point to the fact that Plaintiffs are prominent kosher caterers well known in the Persian Jewish community in Southern California; had been on The Real Housewives of Beverly Hills; and that the "sheer amount of attention that Farnad's Facebook post garnered evinces Plaintiffs' notoriety in the community."

22

We do not agree.  Like the bakery in *Woodhill Ventures*, Beverly Catering is a small business, and there are other caterers who serve the Persian Jewish community.  A mere reference to Beverly Catering in the Real Housewives of Beverly Hills (at some unknown date, not in the record) is insufficient to qualify it as being in the public eye.  Similarly, the bakery plaintiff in *Woodhill Ventures* had been mentioned in national publications, yet, as in that case, we believe "supposed proximit[y] to fame do[es] not turn this into a case of public interest."  (*Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 634; cf. *Nygard, Inc. v. Uusi-Kerttula*, *supra*, 159 Cal.App.4th 1027 [concluding magazine article concerning a Finnish celebrity, Peter Nygard, the chairman and founder of an international company with over 12,000 employees worldwide and whose famous Bahamas residence which had been the subject of much publicity in Finland, was an issue of interest to the Finnish public].)  Further, appellate courts have rejected the idea that "any statement about a person in the public eye is sufficient to meet the public interest requirement."  (*Albanese v. Menounos* (2013) 218 Cal.App.4th 923, 934.)  "[W]here the issue is of interest to only a private group, organization, or community, the protected activity must occur in the context of an ongoing controversy, dispute, or discussion, such that its protection would encourage participation in matters of public significance."  (*Id.* at p. 934.)  However, the "online spat," as Defendants' attorney put it, was not part of any such ongoing discussion.

Moreover, Defendants overstate the amount of attention Farnad's Facebook post received.  One hundred people (not 550), including Berookhim, commented on Farnad's post.  Given that Farnad purportedly had 2,680 Facebook friends, made his post

public, and tagged both Beverly Catering and Berookhim in his posts (thereby linking to their profiles and reaching those audiences as well[12]), the response reflected a relatively small portion of the audience he targeted for his angry communications about his dispute with Plaintiffs.[13]

3.    *Defendants' Statements Do Not Affect a Large Number of People Beyond the Parties*

Defendants also argue their statements "could and did" affect a large number of people beyond the parties.  They contend their statements constitute consumer protection information, " 'serv[ing] as a warning' to other members of [their] community as they would likely have dealings with Plaintiffs and such dealings would soon experience similar pandemic related complications."

---

[12] Facebook's Help Center describes, "When you tag someone, that photo or post may be shared with both the person tagged and their friends.  This means that if you haven't already included their friends in the audience, their friends may now be able to see it." (<https://www.facebook.com/help/240051956039320> [as of Oct. 5, 2022].)

[13] We should not be understood as implying that the Persian Jewish community is not a distinct community with its own specialized concerns, some of which may qualify as "public issues" even if those concerns would not qualify as such outside of that community.  However, even accepting Defendants' characterizations, the 100 members of this community affected by the speech at issue here was a very small portion of the Jewish Persian community.  Indeed, as Defendants observe, "without a doubt, there are many tens of thousands of Persian Jews living in Los Angeles."

24

In finding Defendants' statements "may serve as a warning not to use . . . Plaintiffs' services," the trial court accepted Defendants' argument seeking to situate this case within the category of "consumer protection" public interest cases such as *Wilbanks v. Wolk* (2004) 121 Cal.App.4th 883, 993 (*Wilbanks*). We disagree with this classification. In *Wilbanks*, consumer watchdog Gloria Wolk maintained a Web site that provided consumer advice and warnings relating to viatical settlements, which are "arrangements that allow dying persons with life insurance policies to sell their policies to investors for a percentage of the death benefits." (*Id*. at p. 889.) "It [wa]s undisputed that Wolk ha[d] studied the [viatical] industry, ha[d] written books on it, and that her Web site provide[d] consumer information about it, including educating consumers about the potential for fraud." (*Id*. at p. 899.) The plaintiff Scott Wilbanks was the chief executive officer of a viatical settlements broker. Wolk warned that Wilbanks' company was under investigation by the California Department of Insurance, that the company offered incompetent advice, and was unethical. (*Id*. at p. 889.)

In assessing whether Wolk's statements concerned an issue of public interest, the appellate court observed, "[the] plaintiffs are not in the public eye, their business practices do not affect a large number of people and their business practices are not, in and of themselves, a topic of widespread public interest. Consumer information, however, at least when it affects a large number of persons, also generally is viewed as information concerning a matter of public interest." (*Wilbanks*, *supra*, 121 Cal.App.4th at p. 898.) The appellate court explained, "the viatical industry touches a large number of persons, both those who sell their insurance policies and those who invest in viatical

25

settlements. . . . As relevant here, Wolk[, who the court noted had expertise in the field,] identifies the brokers she believes have engaged in unethical or questionable practices, and provides information *for the purpose of* aiding viators and investors to choose between brokers. The information provided by Wolk on this topic, including the statements at issue here, *was more than a report of some earlier conduct or proceeding*; it was consumer protection information." (*Id.* at p. 899, italics added.)

Unlike *Wilbanks*, in which Wolk provided ongoing consumer information relating to the viatical industry, Defendants' posts here concerned a singular and personal small-scale financial dispute[14] between a caterer and customer. This is not sufficient to create an issue of public interest within the meaning of the statute. "[C]onsumer information *that goes beyond a particular interaction between the parties* and implicates matters of public concern that can affect many people is generally deemed to involve an issue of public interest for purposes of the anti-SLAPP statute." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1366, italics added.) Otherwise, contrary to the intention of our Legislature "to encourage continued participation in matters of public significance" (§ 425.16, subd. (a)), every complaint a consumer makes about a business would qualify as a consumer protection information, no matter how limited the complaint is to their personal dispute. Indeed, as the *Woodhill Ventures* court observed, a single complaint is subject to the classic small sample error and does not qualify as a matter of public interest within

---

[14] This is not our characterization. As noted, Facebook comments included suggestions for resort to small claims court or a Better Business Bureau report.

26

the meaning of section 425.16. (See *Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 634.)

Further, although Farnad's post urges "[d]o not use him to cater your events[ and d]o not invite this evil disgusting thief into your joys," we do not agree that Farnad's post is akin to Wolk's Web site or that it qualifies as consumer protection information entitled to anti-SLAPP protection. The purpose of Defendants' posts, as evidenced from the content and other contemporaneous evidence regarding the context was not to provide consumer information. Farnad or his attorneys admit he was "[e]nraged," that his post was an "emotional plea," that he "resorted to a public posting for retribution," and that the community did not ascribe any value to Farnad's posts which they regarded as merely "a legal dispute over a defined amount of money." Indeed, less than an hour before his post, Farnad texted Berookhim that he "f[***]ed with the wrong person." Then, in describing his personal, financial dispute with Plaintiffs, he attacked Berookhim's integrity, calling Berookhim a thief; a disgusting person; a swindling, cheating, disgusting animal; a lame excuse for a human; an evil disgusting thief; a shame to his community; and a swindling lying scam artist. At the end of his post, he tagged both Beverly Catering and Berookhim, ensuring his angry post would reach not only a wider audience, but Plaintiffs' audience, and then concluded his post with a "hashtag" encapsulating the key message he wanted to convey: "Mehran Ron Berookhim [hyperlinked to Berookhim's Facebook page] #thief."[15] But Farnad did not stop there. In response to

---

[15] Given the function of hashtags, this is powerful evidence of Farnad's key message and intent. "Because hashtags are

27

comments to his post, Farnad requested—nearly 50 times—that others share his post and write reviews on Yelp and Google "so everyone recognizes this thief" (or some variation of the same sentiment). Farnad also stated that "Beverly Catering needs to pay." Thus, notwithstanding Farnad's after-the-fact attempt to reframe the purpose of his post and his intention in posting it, the content, timing, and tone of Farnad's post as well as the frequency and volume of his own responses to comments to his post—including statements that those defending Berookhim "look after [their] own affairs" and "stop carrying water for a thief"— strongly indicate his statements were driven by anger and a desire for retribution and leverage in his personal, financial dispute and not in pursuit of a greater public discussion or consumer protection.

Moreover, Defendants' statements did not concern the quality of the Plaintiffs' food or catering services[16] and arose from a unique factual situation that others were unlikely to experience. Farnad made his deposit just before the pandemic required him to postpone or cancel the planned wedding and there was no written contract that addressed the issue of the

_____

specifically designed to summarize, categorize, and contextualize social-media speech, it is easy to see how they could help lend important context to a statement that might or might not be actionable defamation." (*Of Reasonable Readers*, *supra*, 23 Va. J. Soc. Pol'y & Law at p. 165.)

[16] That Farnad sought to hire Plaintiffs and his sister's comment that her brother "obviously had no doubts or your abilities or reputation as a caterer—he was hiring you for the biggest event in his life" suggest Farnad thought Plaintiffs' services were satisfactory.

28

refundability of his deposit.  This specific context was not likely to be one that was widespread.  In addition, at the time Defendants made their statements, due to the consequences of the Covid-19 pandemic, it would have been improbable that others would hire Plaintiffs (or any caterer, for that matter) to cater any events in the foreseeable future and risk losing their deposit in the same manner.  Thus, the functional nexus between Defendants' statements and any asserted claim of consumer protection would be too slight to warrant the protection of the anti-SLAPP statute.  (See *FilmOn*, *supra*, 7 Cal.5th at p. 150 [recognizing § 425.16 movants are adept at drawing tenuous connections between their speech and abstract issues of public interest]; *Woodhill Ventures*, *supra*, 68 Cal.App.5th at p. 632 ["Agile thinkers always can create some kind of link between a statement and an issue of public concern.  All you need is a fondness for abstraction and a knowledge of popular culture"].)

Defendants also cite several other cases for the proposition that "statements made (even to a limited audience) to assist consumers are matters of public concern."  Yet, each of these matters is distinguishable.  (See *Grenier v. Taylor* (2015) 234 Cal.App.4th 471 [internet posts concerning a pastor of a church with membership between 500 to 1000 that he was a child molester and stealing money from the church were connected to an issue of public concern]; *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13 [the defendant's Web site that offered tips on choosing a plastic surgeon, ruminations about plastic surgery in general, as well as assertions that a prominent plastic surgeon produced nightmare results that required the defendant to have reconstructive surgery contributed to the general debate over the pros and cons of undergoing cosmetic surgery]; *Carver v. Bonds*

(2005) 135 Cal.App.4th 328, 344 [newspaper article that warned readers not to rely on doctors' ostensible experience in treating professional athletes and told a cautionary tale of the plaintiff podiatrist exaggerating his experience to include treatment of professional athletes to market his practice involved an issue of public interest]; *Traditional Cat Association, Inc. v. Gilbreath* (2004) 118 Cal.App.4th 392, 397 [concluding, in a matter decided 15 years before *FilmOn* or *Rand*, that comments on Web site concerning litigation between two cat associations and their principals "[g]iven the controversy surrounding the parties' dispute and its evident notoriety in the cat breeding community," concerned matters of public interest in that community]; see also *Woodhill Ventures*, *supra*, 68 Cal.App.5th at pp. 634-635 [distinguishing that matter of a customer complaint from consumer protection matters in *Wilbanks*; *Gilbert v. Sykes*, *supra*; and *Carver v. Bonds*, *supra*].)

4.     *Defendants Social Media Posts Did Not Concern an Issue of Widespread Public Interest Such That They Were Entitled to Anti-SLAPP Protection*

Defendants next argue that their posts involved a topic of widespread interest—"namely, the public interest in Southern California (particularly the Los Angeles area) as to the quality of services provided to the Jewish and Persian Jewish communities by kosher caterers specializing in large events, particular during the Covid-19 [p]andemic." They claim that unlike Yang's statements in *Woodhill Ventures*, Farnad did not seek retribution or to whip up a crowd. Rather, he sought to "warn[ ] similarly situated people in his community about an issue of public interest," and Defendants again contend the "volume of

30

attention" the post gathered evidences that his post opened public debate.

Our high court's recent decision of *Geiser v. Kuhns*, *supra*, 13 Cal.5th 1238 offers useful guidance as to whether the challenged speech here was one of widespread public interest. In *Geiser*, a couple lost their jobs due to the 2008 recession. By 2015, an institutional purchaser bought their home at a foreclosure sale and attempted to evict the couple. The couple sought help from the Alliance of Californians for Community Empowerment (ACCE), "an organization whose mission is 'to save homes from foreclosures' and to 'fight against the displacement of long-term residents.' " (*Id*. at pp. 1243-1244.) Approximately 25 to 30 ACCE members—who had no "personal connection with, or loyalty to," the couple—demonstrated at both the institutional purchaser's offices and the home of its chief executive officer. The chief executive officer sought a restraining order to enjoin any further demonstrations. (*Id*. at pp. 1244, 1251.)

The court concluded that the demonstrations concerned an issue of public interest for purposes of the anti-SLAPP statute even if they also involved a matter of private concern to the individual family, who was evicted from the family home. (*Geiser v. Kuhns*, *supra*, 13 Cal.5th at pp. 1253-1254.) The Supreme Court explained: "It is common knowledge that foreclosures, evictions, and inadequate housing are major issues in communities throughout California, and the participation of more than two dozen members of an advocacy group dedicated to fighting foreclosures and residential displacement must be considered against that backdrop." (*Id*. at p. 1251.) The high court held that the speech implicated a public issue even though

31

it could also be understood to "implicate[ ] a private dispute." (*Id*. at p. 1253.) Notably, in reaching its holding, the court explained "[a] court evaluating an anti-SLAPP motion should take the position of a reasonable, objective observer" in determining whether a public issue is implicated. (*Id*. at p. 1254.) Although the movant's beliefs, motivations, and characterizations may inform the court's analysis, the court may not give them any weight if they are not objectively reasonable. (*Ibid*.)

Following the guidance of *Geiser*, we need not accept Defendants' post-hoc recasting of both the content and the context of their posts, which, objectively, do not comport with the evidence in the record. As we described above, prior to the litigation, Farnad's counsel acknowledged that Farnad's post originated out of his desire for retribution. Additionally, contrary to Defendants' assertion on appeal that Farnad did not seek to "whip up a crowd," he urged those who commented on his post nearly 50 times to repost his post or share a review on Yelp and Google, noted that "Beverly Catering needs to pay," and repeatedly called Berookhim a thief or disgusting in connection with his requests for repost. These facts, among others we described above, belie Defendants' arguments that their speech was unlike Yang's in *Woodhill Ventures* and instead concerned issue of widespread public interest.

An issue of *widespread* public interest is not one that is "of interest to only a limited but definable *portion* of the public, a *narrow* segment of society." (*Du Charme v. International Brotherhood of Electric Workers* (2003) 110 Cal.App.4th 107, 117, 118.) "[I]n cases where the issue is not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the

32

constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance." (*Id.* at p. 119, fn. omitted; see *FilmOn, supra,* 7 Cal.5th at p. 150.) Stated differently, "it is not enough that the statement refer to a subject of widespread public interest; the statement must in some manner *itself contribute to the public debate.*" (*Wilbanks, supra,* 121 Cal.App.4th at p. 898, italics added.)

Defendants attempt to define their statements as connected to an issue of widespread public interest by tethering it to the Covid-19 pandemic. While the pandemic may have occasioned the cancellation of Farnad's wedding, the challenged statements that, for example, Berookhim was a thief, a crook, or a swindling, lying scam artist, have nothing to do with the pandemic. As we alluded to above, " [t]he fact that "a broad and amorphous public interest" can be connected to a specific dispute' is not enough." (*FilmOn, supra,* 7 Cal.5th at p. 150, quoting *Dyer v. Childress* (2007) 147 Cal.App.4th 1273, 1280.) As to the issue of Berookhim's "honor" as a kosher caterer serving the Persian Jewish community, Defendants have not demonstrated that there was an ongoing discussion or debate on this issue or that by their statements that Plaintiffs were thieves, crooks, and swindling lying scam artists, Defendants "participated in, or furthered, the discourse that makes an issue one of public interest." (*FilmOn, supra,* at p. 151; *Geiser v. Kuhns, supra,* 13 Cal.5th at p. 1243

33

["we ask whether the challenged activity contributes to public discussion of any such issue."].)[17]

Accordingly, we conclude that Defendants have not carried their burden in demonstrating the statements at issue in Plaintiffs' complaint concerned an issue of public interest. Because Defendants are not the prevailing parties on their special motion to strike, we deny their request to award them fees and costs.

---

[17] Further, the matter before us lacks the hallmarks in *Geiser* that informed the Supreme Court's decision that the challenged activity there was made in connection with a public issue. As *Geiser* observed, "foreclosures, evictions, and inadequate housing are major issues in communities throughout California." (*Geiser v. Kuhns*, *supra*, 13 Cal.5th at p. 1251.) In contrast, in the early months of the pandemic, a caterer's failure to return an arguably non-refundable deposit following the government's stay-at-home orders simply does not affect the same breadth of people, nor is its impact as great. That the interest in *Geiser* was widespread is borne out by the fact that an advocacy group with membership unrelated to the couple existed to combat foreclosures and displacement of long-term residents as well as the fact that three publications contemporaneously issued articles concerning the controversy. Similar facts evidencing the impact or interest in Defendants' and Plaintiffs' dispute simply do not exist here.

## DISPOSITION

The trial court's order denying the special motion to strike is affirmed.  Defendants' request for fees and costs is denied. Each party is to bear their own costs on appeal.

NOT TO BE PUBLISHED

KELLEY, J.*

We concur:


CHANEY, J.


BENDIX, Acting P. J.

---

\* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.